William H. Narwold (*pro hac vice*)
bnarwold@motleyrice.com
Mathew P. Jasinski (*pro hac vice*)
mjasinski@motleyrice.com
MOTLEY RICE LLC
20 Church St., 17th Floor
Hartford, CT 06103
Tel.: (860) 882-1681
Fax: (860) 882-1682

John P. Cashion (Alaska Bar No. 9806025)
john@cashiongilmore.com
CASHION GILMORE LLC
1007 W. 3rd Ave., Suite 301
Anchorage, AK 99501
Tel.: (907) 222-7936
Fax: (907) 222-7038
john@cashiongilmore.com

Sarah M. Frazier (*pro hac vice*)
sfrazier@bafirm.com
BERG & ANDROPHY
3704 Travis St.
Houston, TX 77002
Tel: (713) 529-5622
Fax: (713) 529-3785

Charles H. Rabon, Jr. (*pro hac vice*)
crabon@usfraudattorneys.com
RABON LAW FIRM, PLLC
225 E. Worthington Ave., Ste. 100
Charlotte, NC 28203
Tel.: (704) 247-3247
Fax: (704) 208-4645

*Attorneys for Relator Ben Ferris*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>*ex. rel.* BEN FERRIS,<br><br>Plaintiff,<br><br>v.<br><br>AFOGNAK NATIVE CORPORATION and<br>ALUTIIQ, LLC,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 3:15-cv-00150-HRH<br><br>**SECOND AMENDED<br>COMPLAINT<br>FILED PURSUANT TO<br>31 U.S.C. §§ 3729-3732<br>FEDERAL FALSE CLAIMS ACT**<br><br>JURY TRIAL DEMANDED |

**Unredacted Version**

# TABLE OF CONTENTS

I.      INTRODUCTION TO CASE ............................................................................ 1

II.     PARTIES ................................................................................................. 4
        A.      Plaintiff ..................................................................................... 4
                i.      Relator ........................................................................... 4
        B.      Defendants .................................................................................. 4
                i.      Afognak Native Corporation ................................................... 4
                ii.     Alutiiq, LLC ................................................................... 5

III.    RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY ..................................... 5

IV.     JURISDICTION AND VENUE ....................................................................... 6

V.      STATUTORY BACKGROUND ...................................................................... 6
        A.      Alaska Native Corporations ........................................................... 6
        B.      Small Business Enterprises ............................................................ 7
                i.      NAICS Size of Business Standards .......................................... 7
                ii.     Rules of Affiliation in Applying NAICS Size of Business
                        Standards ........................................................................ 8
        C.      Socially and Economically Disadvantaged Groups and the 8(a) Business
                Development Program - Minority Small Business and Capital Ownership
                Development Program .................................................................. 9
                i.      Socially and Economically Disadvantaged Small Businesses ............ 9
                ii.     Section 8(a) Small Business Must Itself Perform at Least Fifty
                        Percent of Cost of Contract ................................................. 10
        D.      Alaska Native Corporations and the 8(a) Program ............................... 11
                i.      Eligibility ..................................................................... 11
                ii.     Procedure for Enrollment ................................................... 12

VI.     Relator's Discovery of Defendants' Fraud ...................................................... 13

VII.    DEFENDANTS' FRAUDULENT USE OF 8(a) SUBSIDIARIES THROUGHOUT THE
        SUBMISSION OF BIDS AND PERFORMANCE OF GOVERNMENT CONTRACTS ......................... 15
        A.      Afognak – General Organization ..................................................... 15
        B.      Alutiiq and 8(a) Subsidiaries ......................................................... 16
        C.      Fraudulent Existence and Use of 8(a) Subsidiaries .............................. 17
                i.      Afognak's True Operational Structure ..................................... 17
                ii.     Designation of Contracts to the Various 8(a) Companies ............... 19
                iii.    Discussions Among Leadership Regarding Sham 8(a) Companies ........ 20
                iv.     Fraudulent Representation of the General Manager's Role ............ 21
                v.      Fraudulent Representation in SBA 8(a) Application and Annual
                        Updates: Barnes & Conrow ................................................. 22
                vi.     Other Demonstrations and Certifications .................................. 24
                vii.    Alutiiq Melee – Example of Sham 8(a) Entity ............................ 24
                viii.   How Internal Reports Reveal the 8(a) Companies to be Shams ........... 26

D.     Afognak's and Alutiiq's Conspiracy to Create And Use Sham 8(a) Companies ............................................................................................... 29

VIII.   ACTIONABLE CONDUCT BY DEFENDANTS UNDER THE FALSE CLAIMS ACT ..................... 29
        A.     Applicable Law ............................................................................... 29
               i.     The False Claims Act ........................................................... 29
        B.     Defendants' Violation of the FCA ................................................... 34
               i.     Defendants' Fraudulent Representations and Certifications as to
                      Their 8(a) Business Entities Violate the FCA former 31 U.S.C. §
                      3729(a)(1); current 31 U.S.C. § 3729(a)(1)(A)........................... 34
               ii.    Defendants' Fraudulent Representations and Certifications as to
                      Their 8(a) Business Entities Violate the FCA former 31 U.S.C. §
                      3729(a)(2); current 31 U.S.C. § 3729(a)(1)(B)............................ 35

IX.     MATERIALITY ............................................................................................ 37

X.      CAUSES OF ACTION ................................................................................... 43
        A.     COUNT I. – FALSE CLAIMS ACT – 31 U.S.C. § 3729(a)(1) (former); 31
               U.S.C. § 3729(a)(1)(A) (current)....................................................... 43
        B.     COUNT II. – FALSE RECORDS OR STATEMENTS – 31 U.S.C. § 3729(a)(2)
               (former); 31 U.S.C. § 3729(a)(1)(B) (current)................................... 44

RELIEF 46

PRAYER.............................................................................................................. 46

JURY DEMAND .................................................................................................... 47

Case 3:15-cv-00150-HRH   Document 217   Filed 01/03/17   Page 3 of 53

1.      Plaintiff/Relator Ben Ferris submits this Second Amended Complaint under 31 U.S.C. § 3729-3732 ("False Claims Act") on behalf of the United States of America and on his own behalf to recover all damages, penalties, and other remedies established by the False Claims Act and would show the following:

## I.      INTRODUCTION TO CASE

**"I asked him, (Elijah Barnes) so what is Bernie (Conrow) GM (General Manager) of and he goes "I dunno," and then Bernie came in and I said "what are you GM of and he said "Alutiiq Melee" and I said "what do you do" and he said "nothing." He says "I'm supposed to visit the company once every six months." So I said "Well where you gonna do that?" and he says "I dunno, I don't know where they are at." "I am a Senior Vice President and I couldn't tell you who the GMs of our companies are…."[1]**

**"Do you think if we were running subsidiaries like companies, like if Guards was a subsidiary, we wouldn't have gotten to where we are now?"
"No we would not – no we couldn't."[2]**

2.      For the last seven years, Afognak Native Corporation ("Afognak NC") and its wholly owned subsidiary, Alutiiq, LLC ("Alutiiq"), have made a mockery of laws that are meant to remedy the historical treatment of Native Alaskans through favorable consideration for government contracts.  Not content with its considerable statutory advantages, in 2007 Afognak NC adopted an operational structure in which its multiple 8(a) companies–supposedly the government's contractual partners–exist only as names on bids and invoices.  These 8(a) companies are cycled through the bidding process, thereby obtaining government contracts, and eventually capture so much business for themselves that they become too big to qualify for subsequent bids.  By employing these sham companies while illegally misrepresenting to the

---

[1] Relator Ferris's recorded conversation with Senior Vice President Ron Hancock wherein Hancock is telling Ferris that Afognak's 8(a) business entities do not exist, that the alleged General Managers of such entities don't even know the entities of which they are in charge and that the General Managers do no work for such entities.  All the work performed is for the Afognak's divisions.

[2] Relator Ferris's recorded conversation with Senior Vice President Ron Hancock discussing the fact that Afognak's 8(a) subsidiaries do not exist.  Ferris asked the question and Hancock responded.

1

Government that the companies were real and performed the contracts at issue, Afognak NC has freed up a central core of employees to assign to whatever contract arises, thereby gaining unfair competitive advantages over other native Alaskan companies. By 2012, after six years of perpetrating this scheme, Afognak NC had doubled its 2007 revenue and become the sixth largest Alaska Native Corporation in the United States.

3.      In recognition of the social and economic hardships that have long plagued Native Americans, Congress in 1986 enacted legislation that allowed the Indian tribes, including Native Alaska Corporations, to participate in the 8(a) Business Development program. The 8(a) Business Development Program was originally created by the United States to provide socially and economically disadvantaged small businesses the "maximum practical opportunities" to participate in the marketplace of government contracting. Eligibility for the program requires an applicant to be a "small business concern" and is good for no longer than nine years.

4.      The Afognak NC participates in the Small Business Association's 8(a) Business Development Program through its wholly-owned subsidiary Alutiiq. Since 2007, Defendant Afognak NC, through Alutiiq, has been awarded millions of dollars in government contracts. In its submission of bids for these contracts, Afognak represents that the particular small business included in the submission paperwork qualifies as an 8(a) business. It also certifies to the government that the particular 8(a) business entity will perform the contract and is in compliance with laws requiring it to perform some portion of the contract itself, typically 50%. 13 CFR 125.6. Once awarded these numerous contracts, Afognak NC presents claims to the United States government for payment under these contracts based on these same representations and certifications regarding the 8(a) business entity that performed the contracted work therein.

5.      These certifications and representations are all false.  Afognak NC's sham 8(a) entities exist only on paper, and in no way perform these contracts.  In actuality it is the business divisions within Alutiiq's corporate structure that bid on and perform the government contracts on a nationwide basis.  While the 8(a) companies' bids name the General Managers who will be responsible for performing the contract if awarded, these managers are not aware that the division is submitting a bid to the Government in the names of their 8(a) companies.  It is the Senior Vice Presidents of these divisions who submit the bids and decide which sham 8(a) will be included in the paperwork submitted to the government so as to qualify for these government contracts.  The Senior Vice Presidents and their employees oversee and manage the division's contracts, and division employees perform the contracts nationwide.  The 8(a) entities exist merely as conduits to obtaining government contracts which would otherwise only be available to qualified 8(a) small business entities.

6.      Thus, while corporate niceties are observed in communications with the Government, within Afognak NC and Alutiiq there is no pretense concerning the fictional nature of the 8(a) entities.  When the entities are mentioned at all, they are the topic of worried jokes circulating about the companies' resultant exposure.  In the meantime, while Afognak NC and Alutiiq balloon in size, the Government continues to pay these fictional 8(a) companies as though they were actual Alaska Native small businesses capable of performance instead of mere placeholders on accounting ledgers.

3

## II.    PARTIES

### A. Plaintiff

#### i.    Relator

7.    Relator Ben Ferris is a citizen of the United States and a resident of the state of Virginia.

### B. Defendants

#### i.    Afognak Native Corporation

8.    Afognak NC, headquartered in Kodiak, Alaska, is an Alaska Village Corporation formed under the 1971 Alaska Native Claims Settlement Act (ANCSA).  Afognak NC was organized in 1977 through a merger of the Port Lyons Native Corporation and Natives of Afognak, Inc.  It is part of the Koniag Regional Corporation.  Originally, Afognak NC's primary focus was the timber development opportunities in the state of Alaska.  As those opportunities began to diminish in the late 1990s, the corporation turned to government contracting.  It utilized the Small Business Administration's 8(a) Business Development program to build its government contracting interests.  Since 2007, Richard M. Hobbs II has been the Chief Executive Officer and President of Afognak NC as well as its wholly owned subsidiary, Alutiiq.  He has been with Afognak NC since 2000.  Dean J. Clowers has been the Executive Vice President of Afognak NC and Alutiiq since April of 2008.  Government contracting has been a successful endeavor for Afognak NC as its gross profits rose from $ 528 million in the year 2005 to $ 800 million in 2010. In 2012, it was ranked the sixth largest Alaska Native Corporation.

9.    Afognak's Registered Agent is Richard M. Hobbs who may be served at 3909 Arctic Boulevard, Suite 400, Anchorage Alaska, 99503.

####        ii.        **Alutiiq, LLC**

10.        Alutiiq is a wholly-owned subsidiary of Afognak NC.  It is Afognak NC's holding company for the 8(a) subsidiaries and small businesses at issue.  Headquartered in Anchorage, it employs over 5,000 people throughout the United States, several territories and abroad.  Alutiiq, through Afognak NC, provides a variety of services to the United States federal government, including security services, logistics, operations and maintenance services, construction, IT/technical services, training services, oilfield services and leasing services.

11.        Alutiiq's registered agent is Richard M. Hobbs, who may be served at 3909 Arctic Boulevard, Suite 400, Anchorage, Alaska, 99503.

12.        Afognak NC and Alutiiq will herein collectively be referred to as "Afognak" or "Defendants."

###        III.        RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY

13.        Any and all acts alleged herein to have been committed by Defendants Afognak NC and Alutiiq were committed by officers, directors, employees, representatives, or agents of those respective defendants, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

14.        Afognak NC and Alutiiq are related entities sharing common employees, offices, and business names such that they are jointly and severally liable under legal theories of respondeat superior.  Further, the past, present and continuing relations and dealings by and between these related entities are so inextricably intertwined that for the purposes of this suit the two Defendants can and should be considered as a single entity at law and equity.

5

## IV. JURISDICTION AND VENUE

15.     Jurisdiction and venue are proper in this Court pursuant to the False Claims Act (31 U.S.C. § 3732(a)) because Relator's claims seek remedies on behalf of the United States for multiple violations of 31 U.S.C. § 3729 in the United States by the Defendants, some of which occurred in the Northern District of Alabama, Huntsville Division and because the Defendants transact other business with the Northern District of Alabama, Huntsville Division.

16.     All of the named Defendants engage in business in the State of Alabama and within the Northern District of Alabama, Huntsville Division, all of which business it engages in through its corporate center, business units, subsidiaries, officers, directors, employees, and agents. All of the named Defendants are subject to the general and specific personal jurisdiction of this Court pursuant to 31 U.S.C. § 3732(a) in that the claims for relief in this action are brought on behalf of the United States for multiple violations of 31 U.S.C. § 3729.

## V. STATUTORY BACKGROUND

### A. Alaska Native Corporations

17.     Citing the "immediate need for a fair and just settlement" of all aboriginal land claims, Congress enacted the Alaska Native Claims Settlement Act (ANCSA) in 1971. Pub.L.No.92-203. 85 Stat. 688 (1971)(codified as amended at 43 U.S.C. §§ 1601-1629(h)). By its terms, the ANCSA applies to over two hundred Native villages and urban areas located in Alaska. 43 U.S.C. § 16010(b)(1). The ANCSA defines "Native" as a citizen of the United States with one-fourth degree or more Alaska Indian, Eskimo, or Aleut blood or a combination thereof. 43 U.S.C. § 1602(b). Each of these villages and urban areas is organized into twelve regional corporations and a thirteenth region was created for the benefit of Natives living outside of Alaska. The ANCSA also authorizes Natives living in Native villages within each of the twelve regional corporations to

6

be organized as either for-profit corporations or not-for-profit corporations. 43 U.S.C. § 1607(a). The village corporations are organized as a business under the laws of the State of Alaska for and on behalf of a Native village. 43 U.S.C. § 1602(j). The ANCSA defines the term Native Corporation to mean any regional corporation, any village corporation, any urban corporation and any group corporation. 43 U.S.C. § 1602(m). Afognak NC is organized as a for-profit village corporation.

## B. Small Business Enterprises

18. Small business concerns are eligible to participate in Title 15 United States Code Chapter 14A "Aid to Small Businesses," which governs the United States' aid and assistance to small business enterprises. 15 U.S.C. §§ 631 *et seq*. In enacting Chapter 14A, Congress intended the Small Business Administration ("SBA") (through statute and rules and regulations promulgated under it, such as 13 CFR Chapter 1 "Small Business Administration" and FAR Part 19 "Small Business Programs") to preserve free competition enterprise for small businesses by ensuring that a fair proportion of the government's total purchases, contracts, and subcontracts for property and services be awarded to small business concerns. 15 U.S.C. § 631(a).

### i. NAICS Size of Business Standards

19. A "small business concern" is defined as one that is "independently owned and operated" and is "not dominant in its field of operation." 15 U.S.C. § 632(a)(1). The SBA determines the size of a business and whether it qualifies as a "small business" by utilizing the North American Industry Classification System (NAICS). This system includes definitions for each business industry and assigns codes to all economic activity within twenty broad sections. 13 C.F.R. § 121.101. The SBA provides a full table of small business size standards matched to the NAICS. 13. C.F.R. § 121.201. The SBA assigns each qualifying small business a particular

NAICS code. These codes are not specific to the particular small business but are particular to the economic activity in which the small business is engaged. When the NAIC code is assigned, the SBA also includes a corresponding contract dollar amount, or "cap" that the small business entity may not exceed. This cap represents the dollar amount that the company may earn through its government contracts. The capped dollar amount may be applied on bids for more than one contract as long as the total contract dollars awarded do not exceed this pre-determined cap. If a qualified small business exceeds the cap, it will no longer qualify for the SBA program.

### ii. Rules of Affiliation in Applying NAICS Size of Business Standards

20. Rules promulgated under 15 U.S.C. § 632 hold that when determining whether a business is a small business concern, an "affiliate" of the business is considered one and the same with that business if it or a common parent has the power to control the small business as determined by a number of factors such as ownership and common management. 13 C.F.R. § 121.103 (a)(1) and (2). Affiliation with a parent or sibling corporation cannot be found in the case of a business concern owned by an Alaska Native Corporation, however, on the basis of such ownership, control, or common management. 13 C.F.R. § 121.103(2)(i). Affiliation also will not be found as to a business concern owned by an Alaska Native Corporation based on the performance of common administrative services, such as bookkeeping and payroll, as long as adequate payment is provided for those services. 13 C.F.R. § 121.103(2)(ii). It is possible, however, to find affiliation among an Alaska Native Corporation and its business entities for "other reasons" as determined by looking at the totality of circumstances on a case by case basis. 13 C.F.R. § 121.103(2)(ii).

**C. Socially and Economically Disadvantaged Groups and the 8(a) Business Development Program - Minority Small Business and Capital Ownership Development Program**

21.     Section 8(a) of the Small Business Investment Act of 1958 authorizes the SBA to itself enter into prime contracts with Federal agencies and to subcontract the performance of the contract to small business enterprises.  Executive Order 11458 authorizes the use of Section 8(a) to assist minority businesses and established the 8(a) program, as it is more commonly referred.  The SBA refers to this program as the 8(a) Business Development Program.  FAR 19.800(e).

22.     The SBA may award the 8(a) contracts in three ways: (1) it may allow all 8(a) qualifying business to submit bids for the contract; (2) it may allow the 8(a) business to contract directly with the government agency or department offering the contract; or (3) it may procure the contract from a government agency on behalf of the 8(a) Program and award it to a single 8(a) business on a "sole source," non-competitive basis.  13 C.F.R. §§ 124.502 – 503.

**i.     Socially and Economically Disadvantaged Small Businesses**

23.     Currently, the SBA is authorized under 15 U.S.C. § 637 to subcontract under the 8(a) program with "socially and economically disadvantaged small business" concerns or businesses which are at least owned by one or more socially and economically disadvantaged individuals and whose management and daily operations are controlled by such individuals.  15 U.S.C. § 637(a)(4)(A)-(B).  Congress defines "socially and economically disadvantaged" groups to include, among other minorities, Native Americans and Indian tribes. 15 U.S.C. § 631(f)(1)(B) &(C).  Thus, Alaska Native Corporations that are small businesses are among the groups eligible to qualify for the SBA's 8(a) Program.

24.     Section 15 U.S.C. § 637(a) specifies that these particular small businesses will have "maximum practical opportunities" to participate in contract performance consistent with efficient performance.  15 U.S.C. § 637(d)(1).  In conjunction with FAR 19.800 *et seq*. "Contracting with

9

the Small Business Administration (The 8(a) Program)," the SBA is authorized to enter all types of contracts with other agencies and subcontract with firms eligible for the 8(a) program in order to perform those contracts.  FAR 19.800(a).

### ii.   Section 8(a) Small Business Must Itself Perform at Least Fifty Percent of Cost of Contract

25.     The SBA requires that the 8(a) participants perform certain percentages of the contracted work with its own employees.  13 C.F.R. § 124.510(a).  An 8(a) participant must certify in its bid offer that it will meet the applicable performance of work required.   13 C.F.R. § 124.510(b).  Compliance with these requirements is determined as of the date of the contract award.  Id.

26.     When the 8(a) participant is awarded an "indefinite quantity" contract, it must demonstrate to the SBA on a semi-annual basis that it has performed fifty percent of the applicable costs for the combined total of all the task orders issued under the contract within that six month period. 13 C.F.R. § 124.510(c).

27.     When an 8(a) is the prime contractor to a contract for services, the SBA requires that, except for construction contracts, the entity must perform fifty percent of the cost of the contract with its own employees.  13 C.F.R. § 125.6(a)(1).

28.     When the contract is for construction work, the 8(a) entity must perform at least fifteen percent of the cost of the contract with its own employees, excluding the cost of material. 13 C.F.R. § 125.6(a)(3).  In the instance where the contract requires special trade contractors, the 8(a) must perform at least twenty five percent of the cost of the contract with its own employees. 13 C.F.R § 126(a)(4).

29.     In the case of a contract for supplies or products (other than procurement from a non-manufacturer in such supplies or products) the 8(a) must perform fifty percent of the cost of

10

manufacturing the supplies or products, not including the cost of materials. 13 C.F.R. § 125.6(a)(2).

### D. **Alaska Native Corporations and the 8(a) Program**

#### i. **Eligibility**

30.     In 1986, Indian Tribes, which include Alaska Native Corporations, were first allowed to participate in the 8(a) Business Development Program. P.L. 99-272, § 18015, 100 Stat.370 (1986) (codified at 15. U.S.C. § 637(a)(13). Alaska Native Corporations have the unique requirement among groups participating in the 8(a) program that Alaska natives and descendants of Natives must own a majority of both the total equity of the company and the total voting powers to elect company directors through their holdings of settlement common stock. 13 C.F.R. § 124. 109(a)(1). Alaska Native Corporations that meet these and other ownership requirements,[3] as owners of the 8(a) business entities, are presumed to be socially disadvantaged. 13 C.F.R. § 124.109(a)(2) and (b)(1); 42 U.S.C. §1626(e). So whereas other 8(a) participants have to certify and prove annually that they are economically and socially disadvantaged, the Alaska Native Corporations do not. 13 C.F.R. § 124.112(b). Otherwise, Alaska Native Corporations that are small business concerns face most of the same eligibility requirements as other groups

---

[3]     In addition, the Alaska Native Corporation business entity must be a for-profit business that is a separate and distinct legal entity with articles of organization. 13 C.F.R. § 124.109(a)(3); 13 C.F.R. § 124.109(c)(1). Furthermore, the management and daily operations of the business entity must be substantially controlled by the Alaska Native Corporation, while the business entities may be managed by individuals who are not members of the tribe or Alaska Natives under these circumstances:

"Management may be provided by non-Tribal members if the concern can demonstrate that the Tribe can hire and fire those individuals, that it will retain control of all management decisions common to boards of directors, including strategic planning, budget approval, and the employment and compensation of officers, and that a written management development plan exists which shows how Tribal members will develop managerial skills sufficient to manage the concern or similar Tribally-owned concerns in the future."

13 C.F.R. § 124.1099c)(4)(B).

11

participating in the 8(a) program.  For instance, a company may qualify for the 8(a) program for no longer than nine years.  13 C.F.R. 124.2.  Alaska Native Corporations are excepted, however from two requirements that apply to other 8(a) groups (in addition to their exemption from certain affiliation rules and special ownership requirements, discussed above).  First, business concerns qualifying for the 8(a) program that are linked to groups other than Alaska Native Corporations may have no more than one 8(a) subsidiary in the program, while Alaska Native Corporations have no limits on the number of 8(a) companies that may participate.  15 U.S.C. § 636(j)(11)(B)-(C).  Nevertheless, the individual responsible for the management and daily operations of the 8(a) entities may not manage more than two such business entities.  15 U.S.C. § 636(j)(11)(B)(iii)(II).

31.    Second, as to sole source contracts, other 8(a) participants are limited to participating in sole source contracts that do not exceed $ 4 million dollars for contracts for services, while Alaska Native Corporations do not have such dollar limitations.  13 C.F.R. § 124.506(a)(10(iii)(b).  This means the SBA can procure and award a contract for an Alaska Native Corporation without competition among the other 8(a) participants.  Furthermore, 8(a) participants are limited to the combined total amount of 8(a) contracts as listed in 13 C.F.R. § 124.519(a).

### ii.    Procedure for Enrollment

32.    In order to participate in the SBA's 8(a) program, Afognak has to submit at least two sets of documents that certify its 8(a) entities qualify for participation in the program.  The first document is the 8(a) Business Development 8(a) & (SDB) Application.  In this Application, the applicant is immediately put on notice that all the information included in the application must be true and accurate, as the first sentence of the applications reads " YOUR SIGNATURE ON THIS FORM INDICATES THAT YOU FULLY UNDERSTAND ALL QUESTIONS AND CERTIFIES THAT ALL RESPONSES AND DOCUMENTS ARE TRUTHFUL AND

12

ACCURATE." Information included in the application includes information about the individual owners and managers, the background and ownership of the business concern applying to the program, the entity's NAICS code, and the entity's business purpose and scope.

33.     For each year the 8(a) entity participates in the program, it must submit the 8(a) Business Development (8(a) & SBD) Annual Review document. The information is collected to ensure the 8(a) entity's continued eligibility in the program. The 8(a) participant also certifies through its signature that all the information in the annual update and attachments is "true, correct and accurate." The information in this annual update includes the entity's current contracts, pending contracts, and corresponding financial information as well as the entity's business plan forecast and development plan.

## VI.     RELATOR'S DISCOVERY OF DEFENDANTS' FRAUD

34.     Relator Ben Ferris is currently Afognak's Chief Compliance Officer, having come to Afognak in 2008. He is a retired Navy officer with ten years of experience in private industry.

35.     Ferris works in Afognak's Chesapeake, Virginia Facility Service Center. This facility service center, together with facility service centers in Anchorage, Alaska and Huntsville, Alabama houses Afognak's General & Administrative Department for its nationwide operations, including administration of Afognak's benefits and payroll, human resources, and finance services.

36.     Afognak hired Mr. Ferris in 2008 as its Corporate Security Manager. This position involved gaining government clearance for Afognak's employees as well as its buildings. He also was responsible for creating policy on security issues such as the use of employees' badges and cameras throughout the company's buildings. Afognak's General Counsel, who at this time was also the company's Chief Compliance Officer, looked to Ferris for assistance with research projects such as the impact of the Anti-Kickback statutes on the company's business as well as

13

other ethical and compliance issues. During Relator's research on ethical and compliance issues while developing the company's compliance program and policies, he realized that the General Counsel should not also be the Chief Compliance Officer, as this raised conflict of interest issues. When he raised the topic of separating the positions, the General Counsel and eventually the Afognak's Board of Directors agreed with his reasoning. In 2011, Ferris was appointed the company's Chief Compliance Officer.

37. Afognak actively participates in the Native American Contracts Association ("NACA"). Formed in 2003, NACA is a national advocacy group for it members: the Tribally-owned Corporations, Native Hawaiian organizations and Alaska Native Corporations. NACA assists its members to compete more effectively for government contracts. In June 2012, NACA held a conference in Seattle, Washington that focused on ethics and compliance issues and Relator Ferris, as Afognak's Chief Compliance Officer, was asked to be Keynote Speaker.

38. The Presumed Loss Rule had just been implemented, significantly increasing the fines for noncompliance with government contracting regulations, and that was one focus of the conference. During the question and answer session following his speech Ferris began to question whether Afognak's operations were in compliance with the small business certification laws and regulations. He could not fully answer some of the questions posed regarding the company's organization and operations of its many 8(a) subsidiaries. Ferris was further perplexed upon attending sessions and receiving handouts on the new Presumed Loss Rule. After attending these sessions and reading the materials, he realized Afognak was misrepresenting its small business status in their submissions for government contracts, as well as in the performance of these contracts. He knew that the 8(a) business entities did not exist as separate entities. He knew that

14

it was (and still is) Afognak's business divisions that submitted the bids and whose employees performed the government contracts.

39.     Ferris returned from the conference and sent e-mails to Afognak's Chief Executive Officer Richard Hobbs III, among others, with his concerns regarding the corporation's business structure and organization. He expressed his concerns that Afognak was misrepresenting and falsely certifying that 8(a) business entities were bidding on and performing the awarded government contracts because these entities did not actually exist as separate business entities. Afognak's management did not share Ferris' concerns. Ferris's concerns continue to be brushed aside to this day.

## VII.    DEFENDANTS' FRAUDULENT USE OF 8(a) SUBSIDIARIES THROUGHOUT THE SUBMISSION OF BIDS AND PERFORMANCE OF GOVERNMENT CONTRACTS

### A.    Afognak – General Organization

40.     Afognak is the sixth largest Alaska Native Corporation, with revenues nearing $800 million from a myriad of government contracts. Afognak is divided into eight divisions. Each division provides separate and unique services to government contractors. The "Guards" division, recently merged with the "Emergency Management Services and Electronic Security Division and is now named, "Protective Services Division." This division provides physical security services and systems for government property. It provides the actual workforce needed to maintain security for government property and buildings. It also provides electronic security systems, such as installing gates at military installations and closed circuit television systems.

41.     The Logistics, Operations and Management division provides services such as building maintenance. This division currently has a very large contract with the United States Navy providing logistics and base operation services for naval bases.

15

42.     The Technical Services Support division, headquartered in Huntsville, Alabama, provides IT support to government entities.  The Construction division provides construction services primarily for military bases and government buildings.

43.     The Energy and Oilfield Services division provides a variety of services related to the oil field activity on the North Slope in Alaska.  The Leasing division primarily provides pre-fabricated camps to contractors working and living on the North Slope.

44.     The Community Power Corporation headquartered in Colorado is a commercial venture producing bio-waste generators that recycle bio-waste such as spoiled food.

45.     Finally, the Lumber/Timber division continues to work in Afognak's original industry through timber development ventures and contracts.  Afognak began its government contracting business, utilizing the Small Business Administration's 8(a) business development program when timber development opportunities and revenue began to wane and the company needed new revenue sources.

46.     In 2006, Richard Hobbs II became the Chief Executive Officer of Afognak and Alutiiq.  In this capacity he oversaw the business development and operational management of Afognak and Alutiiq.  He developed the corporation's existing organizational structure of separate divisions.  Each division, as explained above, is involved in a different industry that provides services to government agencies.  Hobbs appointed a Senior Vice President to be in charge of each of the divisions.  He expanded the corporation's government contracting interests beyond the realm of security and technology services through the use of multiple 8(a) business entities.

B.  **Alutiiq and 8(a) Subsidiaries**

47.     Alutiiq, a wholly-owned subsidiary of Afognak, is the corporation's holding company for the 8(a) subsidiaries and small businesses.  Originally, in the 1990's, when Afognak

16

Case 3:15-cv-00150-HRH   Document 217   Filed 01/03/17   Page 19 of 53

began to move from the timber development ventures into government contracting, Alutiiq held

one subsidiary – The Alutiiq Security and Technology Company ("AS&T"). AS&T was classified

as an SBA 8(a) business entity. Its primary business was to provide security and technological

security services for government properties. Ron Hancock was the company's CEO. Through its

government contracting, AS&T developed into a larger company, reached the size limits for the

8(a) business development purposes and graduated from the program.

48.     As Alaska Native Corporations are permitted to continually create 8(a) business

entities due to the exceptions granted under the SBA governing laws and regulations, Afognak,

through Alutiiq, continued to create more subsidiaries and expand its government contracting

business. Robert Hobbs replaced the CEO position for each of these entities with a General

Manager and a Management Committee. Robert Hobbs and Dean Clowers are members of each

Management Committee.

**C. Fraudulent Existence and Use of 8(a) Subsidiaries**

    **i.     Afognak's True Operational Structure**

49.     Currently, according to Afognak's organizational charts, it has approximately

fourteen current and former 8(a) small business subsidiaries: Alutiiq-Melee, LLC; Alutiiq

Business Services, LLC; Alutiiq Professional Services LLC; Alutiiq Education & Training LLC;

Alutiiq Commercial Enterprises, LLC; Alutiiq Technical Services, LLC; Alutiiq Oilfield Solutions

LLC; Alutiiq Management Services, LLC; Alutiiq Manufacturing Contractors, LLC; Alutiiq

Global Solutions, LLC; Alutiiq International Solutions, LLC; Alutiiq 3SG, LLC; Alutiiq General

Contractors, LLC; Alutiiq Diversified Services, LLC, Alutiiq Pacific, LLC; Alutiiq Advanced

Security Solutions, LLC; and Alutiiq Professional Training, LLC. Based on the submissions,

representations, and certifications to the SBA by Afognak, such as in the 8(a) Business

Development (8(a) & SDB) Application and the 8(a) Business Development (8(a) & SDB) Annual Review, each of these 8(a) entities is a separate legal entity engaged in government contract work. Afognak represents and certifies that the aim of each of its 8(a) entities is to obtain a sufficient amount of contracts for continued growth and development. *See* Exhibits 5 – 10.[4] Further, it represents and certifies that the objective of each of its 8(a) entities is to eventually graduate from of the SBA's business development program. These submitted representations and certifications to the SBA appear to fully comply with the SBA's requirements – except for the fact that these companies are simply sham entities created to qualify for and garner these lucrative government contracts.

50.     In furtherance of its scheme in creating sham 8(a) entities, Afognak appoints a General Manager to each of the entities. As the company represents in its paperwork submitted to the SBA mentioned above, the General Manager is expected to manage and oversee the business concerns' operations, including the performance of the awarded government contracts. Afognak represents and certifies in such paperwork that each of the appointed General Managers has the expertise and background that aligns with the particular 8(a) entities' industry focus. *See* Exhibits 5 – 10.

51.     Yet these General Managers, who are employees of the eight divisions, by their own admission, do nothing more than sign some paperwork for the 8(a) entity, as more fully explained below. The General Manager does not and is not able to work for the 8(a) entity, because the business entity is merely a fiction created to game a government program designed to economically assist the disadvantaged Alaskan Natives.

---

[4] Unless otherwise indicated, references to "Exhibit __" are to the exhibits attached to the original Complaint and First Amended Complaint, which are herewith incorporated by reference.

18

52.     In fact, it is each of Afognak's eight divisions, which Robert Hobbs created, that submit the bids for the government contracts, select the 8(a) entity that will be included in the submission and once the contract is awarded, oversee and manage the contract's performance.  The sole purpose for the 8(a) entities is to enable Afognak to bid on the sole source government contracts and to increase the corporation's overall revenues.

### ii.     Designation of Contracts to the Various 8(a) Companies

53.     The Senior Vice President of each division decides on the government contract for which to submit a bid.  The selected contract generally falls within the range of services that the division provides.  The 8(a) entity is selected not because the sham company has some particular expertise that will assist in the performance of the contract; rather it is selected to be included in the submission because it has a sufficient amount of contract dollars remaining under its NAICS code cap.  The selected 8(a) entity will still have some contract dollars available that were originally awarded when it was granted the NAICS code.  The sham entity and the available monies are now used by the division to fraudulently certify eligibility to participate in the government contract.

54.     The fact that these business entities are sham entities is common knowledge throughout Afognak.  Except for the first 8(a) subsidiary AS&T, none of the subsidiaries currently listed as 8(a) entities on the corporation's website, organization charts, and monthly management reports exist as separate business entities.  Since 2007, the Defendant's focus has only been on the particular division that controls the day-to-day management and operation of the contract performance.

19

### iii. Discussions Among Leadership Regarding Sham 8(a) Companies

55.     There exists corporate-wide knowledge that the 8(a) entities Afognak has created are really sham entities, as evidenced through the tape-recorded conversation between Relator Ferris, Chief Compliance Officer and Ron Hancock, Senior Vice President of Business Development.[5]   This conversation occurred in Ferris's office at Afognak's headquarters in Chesapeake, Virginia.  Ferris and Hancock discussed the fact that the subsidiaries are not run like companies.   The two acknowledged that, had the subsidiaries been run as companies, the Defendant would not have grown into an $800 million dollar corporation.  Hancock stated "we grew but we did it by cheating and by breaking the rules."  Hancock told Ferris that he had gotten into a "shouting match" with Dean Clowers, Executive Vice President of Afognak NC and Alutiiq, regarding the fact that the divisions actually bid and do the work – not the 8(a) subsidiaries. Furthermore, Hancock stated that after he reviewed the material Ferris gathered from the NACA conference in 2012, there was no doubt in his "military mind" that Afognak was fraudulently conducting its business practices as related to the subsidiaries.

56.     During this conversation Hancock also compared Afognak business practices to another village corporation – Goldbelt, Incorporated (Goldbelt).  Hancock noted that if a potential customer were to go onto Afognak's website to look for any of the companies, the customer would not be able to find any information because they don't exist.  The only information on Afognak's website pertains to the different divisions and the services that these divisions provide.  Hancock told Ferris that if one were to visit the Goldbelt website, "you can click on a particular company and it tells you about that company."  He explained to Ferris that "the reason we [Afognak] don't

---

[5] Virginia is a one-party consent law -- meaning that there is no prohibition against recording conversations so long as one party is aware and consents to the recording. *See* Virginia Code § 19.2-62. Both Ferris and Hancock were in the state of Virginia at the time that the recording was made and Ferris was aware and consented to the recording

have that [on our website] is we have nothing to tell them." There is nothing to tell because these 8(a) subsidiaries are sham entities that do not actually perform the work for which the contracts are awarded. It is the Defendants' eight divisions that actually provide the services. *See* for example Exhibit 11.

### iv. Fraudulent Representation of the General Manager's Role

57. As noted above, when Richard Hobbs became Chief Executive Officer and President of Afognak Native Corporation and Alutiiq, he chose to use General Managers instead of CEO's as heads of the 8(a) entities he was creating. The General Manager is represented to the SBA as a manager of the business entity who oversees the work performed under the entity's awarded contracts. *See* Exhibits 5 – 10.

58. Contrary to the Afognak's representations to the SBA that it selects General Managers for their experience that will assist in the 8(a) success, Afognak does not have any system for choosing GMs. Afognak does not keep a master list of the General Managers assigned to the 8(a) entities. In his recorded conversation with Ron Hancock, Hancock affirmed that "no one knows" who the specific General Managers are. He stated that Afognak does not keep track of "this stuff." He said that Afognak just picks names for General Managers as needed. It does not matter what name is submitted on the paperwork.

59. An example of Afognak's lack of knowledge as to which employee is the General Manager of the 8(a) is evidence in a recent application for a new 8(a) entity. When Afognak submitted its application for its new 8(a) entity, "Ace" Greg Hellesto was listed as the General Manager. Mr. Hellesto had already been fired from Afognak for some time.

60. The reason Afognak does not track this information is because, as Ferris and Hancock agreed, there is nothing to keep track of - these 8(a) entities are shams.

61.     Even the General Managers themselves do not keep track of the 8(a) entities to which they are assigned.  Instead, these division employees and others track the contracts for which they are actually responsible.  For example, Sandy Chandler keeps in her office a "white board" upon which she lists all the contracts to which she is assigned.  She has to keep track of the contracts to which she is assigned because the contracts originate from the various divisions, not a particular 8(a) entity.

v.     **Fraudulent Representation in SBA 8(a) Application and Annual Updates: Barnes & Conrow**

62.     During a recent conversation, Hancock told Ferris that he had discussed the General Manager issue with Elijah Barnes and Bernie Conrow, two Afognak employees.  Both Barnes and Conrow work in the Chesapeake, Virginia headquarters.  Bernie Conrow works in the Logistics, Operations, and Management Division.  His title is "Director of Support Services."  He supervises the division's employees who work on submitting the division's contract proposals for government contracts.  Conrow works under Elijah Barnes.  Elijah Barnes is the Vice President of the Logistics, Operations and Management Division.

63.     In the paperwork Afognak has to complete to originally certify the participation of its business entities in the 8(a) program – "8(a) Business Development (8(a) & SDB) Application," as well as required annual updates for each 8(a) entity – "8(a) Business Development (8(a) & SDB) Annual Review," – the SBA requires information about the time that the General Manager listed in the forms will devote to the entity.  The SBA requests this information because 8(a) law and regulations are meant to foster smaller companies into mature prosperous companies with a long term future, and because persons involved in managing the 8(a) business concerns are precluded under regulations from engaging in any other employment or business interests that conflict with or prevent the 8(a) from achieving its business plan objectives.  13 C.F.R. § 124.109(c)(4)(ii).

22

64.     In response, in Section II – Business Management and Administration of the initial application, Defendants certify that the General Manager does indeed devote significant time to the 8(a) entity, promising for instance that the General Manager will work full time with the entity. *See* Exhibits 5 – 10.  Similarly, Defendants' annual updates frequently certify that the General Manager will devote *100 hours a week* to the management of the business concern.  In response to Question 18 of Section II of the annual updates, on the other hand, Afognak has affirmatively replied that the individual holding the business concern's highest position devotes less than full-time to the operations of the applicant business concern, adding in Section III that the General Manager "devotes all the time necessary to the business concern as his first priority."  "His additional time, if any, may be devoted to other Alutiiq companies."  *See* Exhibits 5-7, 9, & 10.

65.     While Defendants' certifications appear to vary as to the extent of the devotion of the General Manager to the 8(a) entity, they are, in any event, all equally false because these General Managers devote no time at all to the entities.  For instance, the company represented and certified that Elijah Barnes was the General Manager of the 8(a) subsidiary Alutiiq Pacific and that Bernie Conrow was the General Manager of Alutiiq Melee.  But in contrast to Afognak's representation to the government that the General Managers devote all the time necessary to the business concern as his first priority, when Hancock asked Barnes and Conrow what they do as General Managers, they both told him, "nothing."  Conrow told Hancock that he was supposed to visit the company once every six months but he did not know where it was located.

66.     Conrow made the same admission to Ferris in a text message dated March 5, 2013.  In reply to Ferris's question about how much work was involved in being a General Manager; Conrow replied that he did not know, as he never did anything "except sign a few papers."  *See* Exhibit 5.  Conrow further explained that he was supposed to visit every six months but he was

23

still waiting for his first trip to Hawaii.  Id.  In 2011, Conrow was appointed as General Manager of Alutiiq Melee, which is headquartered in Hawaii.  Id. He has yet to perform any work for the company.  That is because there is no company to work for and Conrow is actually employed and works for the Logistics, Operations and Management Division of Alaska Native behemoth, Afognak.

### vi.    Other Demonstrations and Certifications

67.    In addition to the certifications described above, to the extent that Defendants entered "indefinite quantity" contracts under which the SBA requires that the 8(a) company demonstrate semi-annually its use of its own employees in performance of such contracts, those demonstrations were false because Defendants' 8(a) companies have no employees at all.  *See* 13 C.F.R. § 124.510(c).

### vii.    Alutiiq Melee – Example of Sham 8(a) Entity

68.    The following is an example of Afognak's misrepresentations and certifications to the SBA that it maintains separate 8(a) business entities and that it is these entities that perform the required percentage of costs of the contract under the awarded government contracts.

69.    Alutiiq Melee is Afognak's 8(a) entity located in Honolulu, Hawaii.  It was originally certified to participate in the 8(a) program on February 2, 2004.  See Exhibit 5.  Its projected termination date was February 2, 2013.  Id.  Its NAICS code is 517911 and is classified in the Telecommunications Resellers Industry.  Id.  Bruce Swagler was the General Manager until 2011, when he resigned.  Id. Bernard Conrow was appointed the new General Manager.  Id.

70.    As noted above, the SBA requires an annual update from each participating 8(a) entity for the continued participation in the SBA 8(a) program.  The information is collected to ensure the 8(a) entity's continued eligibility in the program.  The 8(a) participant also certifies

through its signature that all the information in the annual update and attachments is "true, correct and accurate." The information in this annual update includes the entity's current contracts, the pending contracts, and corresponding financial information, as well as the entity's business plan forecast and development plan. Id.

71.     In its annual update submitted to the SBA for continued participation in 2011, Amanda Huetti, paralegal for Alutiiq, stated in her cover letter accompanying the company's annual submission, that the General Manager was in charge of general oversight and management of the company; she would be, however, the point of contact for all SBA related matters. Id.

72.     Dean Clowers, Executive Vice President of Afognak Native Corporation and Member of Alutiiq Melee's Management Committee, certified in the annual update that Alutiiq Melee met all the requirements set forth in specifically noted sections of 13 C.F.R. § 124 and that all the information contained in this update was true, correct and accurate. *See* Exhibit 5.

73.     Under Tab 10 of this submission, Afognak represented that Bernie Conrow has recently been named as General Manager and that his diverse background would be a strong asset to the company breaking into the competitive market. *See* Exhibit 5. By Conrow's own admission almost two years later, Conrow has done nothing for the company except sign a few pieces of paper. He brought nothing to the business because it does not operate as a separate business.

74.     Further, Alutiiq Melee listed under Tab 11 of the annual update all of the government contracts that it had been awarded and that it was currently performing. Identified in the chart under Tab 11, as Project Numbers 81500 and 81501, are two contracts with the Government Services Agency ("GSA) for the installation of blast proof windows at government buildings in Kentucky and Indiana for the GSA. *See* Exhibit 5. But as evidenced in Afognak's Monthly Management Report for the Twelve Month Period Ending December 31, 2011, discussed

below, it is actually Afognak's Construction Division that submitted the bids for these contracts. *See* Exhibit 2. Furthermore, it is Afognak's Facility Service Center in Huntsville, Alabama, that is actually supervising the work performed under these contracts. Id.

75.     Further, Alutiiq Melee is not, as required by the SBA, performing at least fifteen percent of the contract's cost with its own employees. Those costs are attributed to Afognak's Construction Division. Alutiiq Melee has no involvement with the contract other than being included in the paperwork submitted to the SBA to falsely qualify Afognak as an 8(a) entity and gain illegal access to submit bids on such projects.

### viii.    How Internal Reports Reveal the 8(a) Companies to be Shams

76.     It is evident in the internal reports produced and maintained by Afognak that the work performed under its government contracts was and is performed by the company's divisions and not the individual 8(a) business entities. *See* Exhibits 1-4 &11. Afognak tracks and maintains the performance of each contract awarded to each division, not the separate 8(a) business entities to which these government contracts were allegedly awarded. Id.

77.     For example, Alutiiq – both a holding company and Afognak's wholly-owned subsidiary that warehouses the sham 8(a) subsidiaries and small businesses – produced a report titled Alutiiq FSC Chesapeake Cost Report – Monthly Financial Reports as of February 28, 2013. *See* Exhibit 1. This is the cost report for the Facility Service Center located in Chesapeake, Virginia. The Facility Service Center supervises the contracts being performed by the Defendants in the Chesapeake area. This report contains a section titled "Facilities Allocations." Id. In this section, the financial allocations for Alutiiq's facility service centers nationwide are listed. Id. These cost allocations are listed by the separate divisions that have projects being supervised by the particular facility. Id. These allocations are not tracked or listed by the 8(a) business entities.

26

This is because for all intents and purposes these companies do not exist as separate business entities. Afognak cannot break down the costs associated with each business entity. Afognak only tracks the costs for the separate divisions because only the divisions accumulate these costs through the performance of the contracts. The 8(a) subsidiary is merely a sham created to bid on the 8(a) contracts that Afognak, as one of the country's largest Alaska Native Corporations, would not otherwise be able to bid on and be awarded.

78.     Afognak produces Monthly Management Reports for each month of the year. Although the titles of the included graphs and reports state that the data relates to Afognak Native Corporation and its Subsidiaries, the data contained in each of the individual monthly reports is broken down and analyzed by each division. *See* Exhibits 3 & 4. This data is not broken down by the individual 8(a) subsidiaries. The only data that is broken down according to the 8(a) subsidiaries is the number of employees allegedly employed by each subsidiary. Id. Ferris states that this information is maintained to track the size of the company for SBA purposes. This information serves no other purpose as the employees are assigned to the awarded contracts to each division, not to the alleged 8(a) entities.

79.     Moreover, every contract that is pending or awarded to the Defendants for 2012 is listed in the year ending Monthly Management Report for the Twelve Month Period Ending December 31, 2012 under the Marketing and Operations Status Report. *See* Exhibit 2. These contracts are listed by the divisions that are performing or will be performing the contract. The introductory paragraph to this section which explains the particular coding within the report instructs the reader to find "project specific financial information" in the "Project Summary by Division" reporting found under the Business Unit Performance section. Id. This is yet another example of how the Defendants record and track the performance of the awarded contracts by each

27

of Afognak's divisions rather than by each 8(a) subsidiary, reflecting that it is Afognak that is actually performing the work and not the sham 8(a) subsidiary.

80.     Furthermore, in the Marketing and Operations Status Report, it is noted which branch of the organization is working on the particular contract. *See* Exhibit 2. For example, under the Ft. Bragg SATOC, Ft. Bragg Project listed on page 41 under the Construction Division section, it states that this is a "Huntsville Branch" project. Id. Relator Ferris explains that this notation refers to the Facility Service Center that is actually supervising the work under the contract. This information does not state that a particular 8(a) subsidiary is supervising or performing the contract. That is because the 8(a) subsidiary awarded the contract is not actually performing the contract. Afognak's construction division is performing the contract. The 8(a) subsidiary is nevertheless listed under the section titled Participants. This is simply to keep track of which subsidiary was awarded the contract.

81.     Another example that illustrates the breadth of Afognak's abuse of the government program is found with Project Number 11051. *See* Exhibit 2. Found on page 43 of the Monthly Management Report for the Twelve Month Period Ending December 31, 2012, Project Number 11051 – Hawaii MACC is another contract awarded to the Construction Division. Id. This multi-year contract is for minor construction at the Joint Base Pearl Harbor-Hickam located in Hawaii. The report states that this contract is an "Anchorage Branch" project. Id. This notation means that the Afognak's Anchorage Branch Facility Center is actually supervising the work under this contract. The Anchorage Branch Facility Center is located in Anchorage, Alaska. Why would the Anchorage Branch Facility Center have to supervise the contract when Alutiiq Melee is located in Honolulu, Hawaii? The answer is because Alutiiq Melee is not a business entity capable of supervising or performing that or any other contract – its sole purpose, like that of all of the other

28

sham 8(a) subsidiaries, is to fraudulently capture small business contracts which would otherwise be off-limits to Afognak.

**D. Afognak's and Alutiiq's Conspiracy to Create And Use Sham 8(a) Companies**

82.    Since 2007, the Defendants have worked together to initiate and carry out this protracted scheme to create the sham 8(a) entities listed above in Paragraph 49 in order qualify for and be awarded lucrative government contracts that were set aside for Alaska Native Corporations and other qualified 8(a) participants.  Under Robert Hobbs III's directive, the sham 8(a) companies were created and General Managers were appointed, nominally to manage and oversee the daily operations of the entities, including contract performance.  Afognak repeatedly represented and certified in the SBA paperwork required for acceptance and participation in the 8(a) program that entities were separate business entities in full compliance with the governing rules and regulations.

83.    In actuality, Alutiiq and Afognak NC, working through Afognak NC's eight divisions and with the Senior Vice Presidents, select the government contracts on which to bid, select the sham 8(a) entity to include in such bid, and continually win the government contracts. Then, under Defendants' direction, one or more of Afognak NC's divisions, working through one or more of its facility service centers, perform the contract with no involvement whatever by the 8(a) subsidiary or its named General Manager.

**VIII.  ACTIONABLE CONDUCT BY DEFENDANTS UNDER THE FALSE CLAIMS ACT**

**A. Applicable Law**

**i.    The False Claims Act**

84.    This is an action to recover damages and civil penalties on behalf of the United States and Relator Ferris arising from the false or fraudulent statements, claims, and acts by Defendants made in violation of the False Claims Act, 31 U.S.C. §§ 3729–3732.

29

85.     For conduct occurring before May 20, 2009, the False Claims Act ("FCA")

provides in pertinent part that:

a.      Any person who

(1)     knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(2)     knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

(3)     conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

        ***

(7)     knowingly makes, uses or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government

is liable to the Government for a civil penalty of not less than $5,500 and not more than

$11,000 for each such claim, plus three times the amount of damages sustained by the Government

because of the false or fraudulent claims.  31 U.S.C. § 3729(a).

86.     The FCA defined "claim" at that time to include: "any request or demand, whether

under a contract or otherwise, for money or property which is made to a contractor, grantee, or

other recipient if the United States Government provides any portion of the money or property

which is requested or demanded, or if the Government will reimburse such contractor, grantee, or

other recipient for any portion of the money or property which is requested or demanded."  31

U.S.C § 3729(c).

87.     For conduct occurring after May 20, 2009, the FCA provides that any person who

(A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim (except that this language applies to all claims pending on or after June 7, 2008)

(C)     conspires to defraud the Government by committing a violation of the FCA;

\*\*\*

(G)     knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each such claim, plus three times the amount of damages sustained by the Government because of the false or fraudulent claim.  31 U.S.C. § 3729(a)(1).

88.     The amended FCA defines "claim" as:

(A) mean[ing] any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

89.     The FCA allows any persons having knowledge of a false or fraudulent claim against the Government to bring an action in Federal District Court for themselves and for the United States Government and to share in any recovery as authorized by 31 U.S.C. § 3730.

31

90.     Based on these provisions, Relator Ferris, on behalf of the United States Government, seeks through this action to recover damages and civil penalties arising from Defendants' causation of the submission of false claims to the federal government. In this case, such claims for payment were submitted to the federal government as a result of the government contracts awarded to the Defendants.

91.     The Defendants falsely and/or fraudulently certify in the applications for participation in the SBA's 8(a) program and in the annual reviews that the 8(a) entities listed above in Paragraph 49 are separate business entities owned by Defendants. These entities actually are sham businesses created for the sole purpose of allowing Defendants access to lucrative government contracts to which it otherwise would not have access.

92.     The Defendants falsely and/or fraudulently certify that these business entities will pursue contracts that will allow the business to grow, develop and eventually graduate from the program. The entities do not pursue such contracts; rather it is the Defendant's business divisions that do so.

93.     The Defendants falsely and/or fraudulently certify that the General Managers appointed to the 8(a) entities listed above in Paragraph 49 devote all the time necessary to the particular entity in order for the 8(a) to achieve its business objectives. But, by the General Managers' own admissions, they do not work for the 8(a) entity to which they were assigned in the paperwork. Instead they have their own positions and responsibilities within the Defendants' divisions.

94.     The Defendants falsely and/or fraudulently certify that the 8(a)'s employees will perform the required percentage of the cost of the contract required under each awarded contract.

In fact it is the Defendants – through their separate divisions – that supervised and performed the contracts as evidenced in the Defendants' own internal financial reports.

95.     Defendants falsely and/or fraudulently certify and represent that these sham 8(a) business listed above in Paragraph 49 will and did fully perform each awarded contract from 2007 to the present.  To the extent that Defendants enter "indefinite quantity" contracts under which the SBA requires that the 8(a) company demonstrate semi-annually its use of its own employees in performance of such contracts, those demonstrations are false because Defendants' 8(a) companies listed above in Paragraph 49 have no employees at all.  Because of these false and fraudulent certifications, explicit or implied and the false and fraudulent representations, Relator Ferris believes that the United States has suffered significant damages.

96.     There are no bars to recovery under 31 U.S.C. § 3730(e), and, or in the alternative, Relator Ferris is an original source as defined therein.  Ferris has direct and independent knowledge of the information on which the allegations are based.  To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions.  As required pursuant to 31 U.S.C. §§ 3730(b) and (e), Relator has voluntarily provided information, oral and written, and has sent disclosure statements describing all material evidence and information related to this Second Amended Complaint, both before and contemporaneously with filing, to the Attorney General of the United States and the United States Attorney for the Northern District of Alabama, Huntsville Division.

97.     This Second Amended Complaint details Relator Ferris's discovery and investigation of the Defendants' fraudulent schemes and is supported by documentary evidence.

98.     Relator specifically retains and adopts all exhibits from Relator's Original and First Amended Complaint and incorporates these exhibits in this Second Amended Complaint for all purposes.

**B. Defendants' Violation of the FCA**

**i.     Defendants' Fraudulent Representations and Certifications as to Their 8(a) Business Entities Violate the FCA former 31 U.S.C. § 3729(a)(1); current 31 U.S.C. § 3729(a)(1)(A).**

99.     From 2007 to the present, the Defendants have knowingly presented and/or caused to be presented false and/or fraudulent claims for reimbursement (i.e. for payment or approval) to the United States by falsely and/or fraudulently representing and certifying, expressly and/or impliedly, to the United States that they were in full compliance with the SBA's 8(a) Development Program. The Defendants falsely and/or fraudulently represented that the 8(a) business entities listed above in Paragraph 49 would itself perform the portion of work commensurate to the contract's cost (often 50%) required by law. The Defendants then falsely and/or fraudulently represented that the 8(a) business entities listed above in Paragraph 49 performed the required percentages of the costs of the contracts when they submitted claims for reimbursement under government contracts. The Defendants also falsely certify in the applications for participation in the SBA's 8(a) program and in the annual reviews that the 8(a) entities listed above in Paragraph 49 are separate business entities owned by Defendants, that these business entities will pursue contracts that will allow the business to grow, develop and eventually graduate from the program, that the General Managers appointed to the 8(a) entities devote all the time necessary to the particular entity in order for the 8(a) to achieve its business objectives and that the 8(a) will perform the required percentage of the cost of the contract as required under each awarded contract, and that the 8(a) will and did perform the contracts as required from 2007 to the present. Further and

34

similar misrepresentations and false certifications are conveyed to the SBA and other governmental entities through bills and invoices for work completed.

100. The Defendants' 8(a) business entities listed above in Paragraph 49 are sham entities that exist only for the purpose of garnering the lucrative government contracts available to Alaska Native Corporations. The Defendants' business divisions actually performed the contracts. These contracts were awarded to and performed by a large business corporation – Afognak Native Corporation–and its wholly owned subsidiary, Alutiiq.

101. All of the government contracts awarded to the 8(a) subsidiaries as listed above in Paragraph 49 from 2007 to the present are tainted by this fraud, and therefore the damages are the full amount of those awarded contracts during this time period.

102. Given the structure of the government contracting system, the false statements, false representations, false records, and/ or material omissions made by the Defendants had the potential to influence the payment decisions of the federal government. Because of the fraudulent representations regarding their 8(a) subsidiaries listed above in Paragraph 49 and the work performed under each of their government contracts as described above, Defendants earned hundreds of millions of dollars to which they are not legitimately entitled. The ultimate submission to the federal government of claims for payment was a foreseeable factor in the Government's loss and a consequence of the scheme. As a result, the United States has suffered substantial damages.

ii. **Defendants' Fraudulent Representations and Certifications as to Their 8(a) Business Entities Violate the FCA former 31 U.S.C. § 3729(a)(2); current 31 U.S.C. § 3729(a)(1)(B).**

103. Defendants knowingly made, used or caused to made or used false records or statements with specific intent to cause false and/or fraudulent claims to be paid or approved by the United States. These false statements or records consist of false certifications or

35

representations, expressed or implied of compliance with all laws, including but not limited to the SBA 8(a) Business Development rules and regulations made or caused to be made by Defendants, in requesting payments from the federal government for performing the contracts at issue in this case. The Defendants falsely and/or fraudulently certified, explicitly or implicitly, in the applications for participation in the SBA's 8(a) program and in the annual reviews that their statements were true, accurate and correct. The Defendants falsely and/or fraudulently certified, explicitly or implicitly, that the 8(a) entities as listed above in Paragraph 49 were separate business entities owned by Defendants.

104. The Defendants falsely and/or fraudulently certified, explicitly or implicitly, that these business entities would pursue contracts that would allow the business to grow, develop and eventually graduate from the program.

105. The Defendants falsely and/or fraudulently certified, explicitly or implicitly, that the General Managers manage and oversee the 8(a) entity's performance of the contracts when in fact they do not. The General Managers actually work on the contracts awarded to Defendants' different divisions.

106. When submitting proposals and/or bids on government contracts, the Defendants falsely and/or fraudulently certified, explicitly or implicitly, that the 8(a) would itself perform the portion of work commensurate to the contract's cost (often 50%) required by law. To the extent that Defendants entered "indefinite quantity" contracts under which the SBA requires that the 8(a) company demonstrate semi-annually its use of its own employees in performance of such contracts, those demonstrations were false because Defendants' 8(a) companies listed above in Paragraph 49 have no employees at all.

36

107. The ultimate submission to the federal government of claims for payment, directly or indirectly, was a foreseeable factor in the Government's losses, and a consequence of the Defendants' actions. As a result, the United States Government has suffered substantial damages.

## IX. MATERIALITY

108. Given the structure of the government contracting system at issue, given the Defendants' false statements and representations, and given the false records and/or statements that the Defendants made, used, or caused to be made or used, Defendants' conduct had a natural tendency to influence, or was capable of influencing, the payment decisions of the federal government.

109. To receive an 8(a) contract, a business concern must be a participant in the 8(a) program at the time of the award, 13 C.F.R. § 124.501(g), except that a business concern that has completed 8(a) program term may be awarded a competitive 8(a) contract if it was eligible on the initial date specified for the receipt of offers, and if it continues to meet all other applicable 8(a) eligibility criteria, 13 C.F.R. § 124.507(d).

110. As a threshold matter, a business concern must be "a small business concern" in order to participate in the 8(a) program. 13 C.F.R. §§ 124.102, 124.109(c)(2).

111. The size of an Alaska Native Corporation subsidiary that is not eligible for the 8(a) program is subject to the affiliation rule set forth in 13 C.F.R. § 121.103(b)(2).

112. Although the size of an Alaska Native Corporation subsidiary that otherwise is eligible to participate in the 8(a) program "shall be determined independently without regard to its affiliation with the tribe, any entity of the tribal government, or any other business enterprise owned by the tribe," 13 C.F.R. § 124.109(c)(2)(iii), the SBA also looks to the affiliation rule set

forth in 13 C.F.R. § 121.103(b)(2) for purposes of assessing whether the subsidiary is in fact a "business concern."

113.     In this regard, representations regarding an 8(a) applicant's status as a "business concern"—let alone, a small business concern—are material to the government's payment decisions.

114.     By way of example, in a November 19, 2013 letter to Defendants regarding the 8(a) application for one of their subsidiaries, Alutiiq Advanced Security Solutions, LLC ("AASS"), an SBA business opportunity specialist stated that the application was deficient on, among others, the ground that an inter-company service agreement between Alutiiq and AASS improperly included services that fall outside of the common administrative services permitted under 13 C.F.R. § 121.103(b)(2)(ii).  Exhibit 12 (attached hereto).

115.     In a response dated December 19, 2013, Alutiiq insisted that the introductory clause of the inter-company agreement made it clear that such services are to be provided only to the extent that they are "administrative."  Nevertheless, Alutiiq revised the agreement to clarify that it would provide only those services encompassed in 13 C.F.R. § 121.103(b)(2)(ii).  Exhibit 12 (attached hereto).

116.     Moreover, it has long been the case that a "line of business" does not qualify as a business "concern."  *See Size Appeal of Microtech Industries Inc.*, SBA No. 1866, 1984 WL 996978, at *5 (Jan. 9, 1984); *accord Size Appeal of Blaine Larsen Farms, Inc., Appellant*, SBA No. SIZ-4742, 2005 WL 3481336, at *6 (Oct. 31, 2005).

117.     Likewise, the materiality of representations regarding an 8(a) applicant's size is evidenced by the fact that the government denies 8(a) applications for business concerns that are "other than small." *See, e.g.*, *Size Appeal of: Norris Prof'l Servs., Inc., Appellant*, SBA No. SIZ-

38

5289, 2011 WL 5569440, at *1 (Nov. 1, 2011); *In the Matter of: The Patrick Wolffe Grp., Inc., Petitioner*, SBA No. BDP-275, 2008 WL 541408, at *1 (Feb. 12, 2008).

118. Indeed, under the presumed loss rule—enacted as part of the 2010 Jobs Act—there is "a presumption of loss to the United States based on the total amount expended . . . whenever it is established that a business concern other than a small business concern willfully sought and received the award by misrepresentation." 15 U.S.C. § 632(w)(1); *see also* 13 C.F.R. § 121.108(b)(1) (deeming submission of bid for small business set-aside contract an "affirmative, willful and intentional certification[] of small business size and status").

119. Representations regarding an 8(a) applicant's management also are material to the government's payment decisions.

120. The materiality of representations regarding an 8(a) applicant's management is evidenced by the fact that the government denies 8(a) applications for business concerns that fail to show that they are controlled through individuals with managerial experience of the extent and complexity needed to run the concern. 13 C.F.R. § 124.106; *accord* 13 C.F.R. § 124.109(c)(4)(i); *see, e.g.*, *In the Matter of: David C. Smith & Sons, Inc., Petitioner*, SBA No. BDP-422, 2011 WL 8780735, at *1 (Dec. 7, 2011); *In the Matter of: SS Med., Inc.*, SBA No. MSB-602, 1998 WL 79204, at *6 (Feb. 3, 1998).

121. Section 124.109(c)(4) further provides that 8(a) managers "are precluded from engaging in any outside employment or other business interests which conflict with the management of the concern . . . ." 13 C.F.R. § 124.109(c)(4)(ii). In a July 19, 2012 email to Defendants regarding the 8(a) application for one of their subsidiaries, Alutiiq Commercial Enterprises, LLC, an SBA business opportunity specialist wrote regarding this provision: "Washington wants specific details regarding all outside activities, including involvement in the

39

ANC, holding companies, and sister companies. . . . What we ideally do not want to see is that firms, especially applicant firms and the 8a participants, are sharing managers and employees." Exhibit 13 (attached hereto).

122. Likewise, the government denies 8(a) applications for businesses whose managers are engaged in outside employment or other business interests that conflict with the management of the concern or prevent the concern from achieving the objectives set forth in its business development plan. 13 C.F.R. § 124.106(a)(4); *accord* 13 C.F.R. § 124.109(c)(4)(ii); *see, e.g.*, *In the Matter of: Fletcher Books*, SBA No. MSB-568, 1997 WL 214785, at *5, *9 (Mar. 25, 1997).

123. Representations regarding other 8(a) eligibility criteria also are material to the government's payment decisions.

124. Although an 8(a) program applicant may appeal a denial of its application only if the denial is based solely upon a negative finding of social disadvantage, economic disadvantage, ownership, or control, 15 U.S.C. § 637(a)(9); 13 C.F.R. § 124.206(a), decisions of the Small Business Association's Office of Hearings and Appeals further reveal cases in which the government has denied admission into the 8(a) program to business concerns on other grounds.

125. In this regard, the materiality of representations regarding other 8(a) eligibility criteria is evidenced by, for example, the fact that the government denies 8(a) applications for business concerns that fail to show reasonable prospects for success in competing in the private sector. 13 C.F.R. § 124.107; *accord* 124.109(c)(6); *see, e.g.*, *In the Matter of: A.J. Nesti Materials, Petitioner*, SBA No. BDPE-551, 2015 WL 2448694, at *1 (May 18, 2015).

126. The government may terminate a participant from the 8(a) program for good cause, 13 C.F.R. § 124.303(a), including the "[s]ubmission of false information in the concern's 8(a) BD application, regardless of whether correct information would have caused the concern to be denied

40

admission to the program, and regardless of whether correct information was given to SBA in accompanying documents or by other means." 13 C.F.R. § 124.303(a)(1).

127.    In this regard, the materiality of representations in 8(a) applications is evidenced by the fact that the government terminates 8(a) participants for having submitted false information on their applications to the 8(a) program. *See, e,g.*, *In the Matter of: K.S. Constr. Co., Inc., Petitioner*, SBA No. BDP-401, 2011 WL 8177783, at *1 (July 15, 2011); *In the Matter of: The Vbp Grp., LLC, Petitioner*, SBA No. BDP-326, 2009 WL 8628337, at *11 (June 23, 2009); *In the Matter of: Daisy Elec., Inc., Petitioner*, SBA No. BDP-153, 2001 WL 34886616, at *6 (July 20, 2001).

128.    Good cause for termination also includes the "[f]ailure by the concern to maintain its eligibility for program participation . . . ." 13 C.F.R. § 124.303(a)(2).

129.    In this regard, the materiality of representations regarding 8(a) eligibility criteria is further evidenced by the fact that the government terminates 8(a) participants that fail to maintain their eligibility. *See, e.g.*, *In the Matter of: Anjelink, Inc., Petitioner*, SBA No. BDP-254, 2007 WL 1365704, at *7 (Mar. 8, 2007).

130.    Good cause for termination also includes the "[f]ailure by the concern to pursue competitive and commercial business in accordance with its business plan, or failure in other ways to make reasonable efforts to develop and achieve competitive viability." 13 C.F.R. § 124.303(a)(9).

131.    In this regard, representations regarding an 8(a) entity's growth and development efforts also are material to the government's payment decisions, as evidenced by the fact that the government terminates 8(a) participants that fail to make substantial and sustained efforts to obtain

41

business. *See, e.g.*, *In the Matter of: Sparccom & Associates, Petitioner*, SBA No. BDPT-501, 2013 WL 4502314, at *1 (Aug. 19, 2013).

132.    Likewise, representations regarding an 8(a) entity's compliance with the percentage of work requirement are material to the government's payment decisions, as evidenced by the fact that the government terminates 8(a) participants that fail to comply with the requirement that a participant firm must perform 50 percent of an 8(a) contract if the contract is for services, supplies or products. 13 C.F.R. § 125.6(a); *accord* 13 C.F.R. § 124.510(a); *see, e.g.*, *In the Matter of: Reality Techs., Inc., Petitioner*, SBA No. BDPT-488, 2013 WL 2154002, at *1, *6 (May 3, 2013).

133.    As evidenced by the foregoing correspondence with the SBA described in Paragraphs 114-115 and 121, as well as publicly available information, Defendants knew or had reason to know that the government attached importance to the foregoing size and other eligibility requirements.

134.    Indeed, each 8(a) participant is required to sign a participation agreement (SBA Form 1011), which provides that the 8(a) entity could be terminated for the program for a variety of reasons, including, among others, failure to maintain eligibility for program participation; failure to maintain status as a small business; failure to pursue competitive and commercial business; failure in other ways to make reasonable efforts to develop and achieve competitive viability; and the submission of false information

135.    Moreover, as discussed in Paragraphs 37-39, in mid-2012, Relator expressly raised the presumed loss rule with Defendants' senior management.

136.    In addition, Department of Justice press releases have publicized the government's longstanding efforts to recover for government contracts induced by false representations regarding a business concern's eligibility to participate in the 8(a) program.

42

137.    By way of example, on October 29, 2010, the Department of Justice announced that contractors agreed to pay $200,000 to resolve claims relating to allegations that they had made false statements that their company was controlled by a socially and economically disadvantaged individual in order to obtain 8(a) set-aside contracts from the Department of Defense.

138.    More recently, on July 6, 2015 the Department of Justice announced a $7.8 million settlement in a case involving false statements made to the SBA to obtain 8(a) set-aside contracts.

## X.    CAUSES OF ACTION

### A.   COUNT I. – FALSE CLAIMS ACT – 31 U.S.C. § 3729(a)(1) (former); 31 U.S.C. § 3729(a)(1)(A) (current).

139.    Relator realleges and hereby incorporates by reference each and every allegation contained in all the paragraphs of this Second Amended Complaint.

140.    From 2007 to the present, the Defendants have knowingly presented and/or caused to be presented false and/or fraudulent claims for reimbursement (i.e. for payment or approval) to the United States by falsely and/or fraudulently representing and certifying, expressly and/or impliedly, to the United States that they were in full compliance with the SBA's 8(a) Development Program. The Defendants falsely and/or fraudulently represented that the 8(a) business entity as listed above in Paragraph 49 would itself perform the portion of work commensurate to the contract's cost (often 50%) required by law. The Defendants falsely and/or fraudulently represented that the 8(a) business entities as listed above in Paragraph 49 performed the required percentages of the costs of the contracts when they submitted claims for reimbursement under government contracts. The Defendants also falsely certify in the applications for participation in the SBA's 8(a) program and in the annual reviews that the 8(a) entities are separate business entities owned by Defendants, that these business entities will pursue contracts that will allow the business to grow, develop and eventually graduate from the program, that the General Managers

43

appointed to the 8(a) entities, as listed above in Paragraph 49 devote all the time necessary to the particular entity in order for the 8(a) to achieve its business objectives and that the 8(a) will perform the required percentage of the cost of the contract as required under each awarded contract, and that the 8(a) will and did perform the contracts as required from 2007 to the present. To the extent that the Defendants have entered "indefinite quantity contracts" on behalf of their sham 8(a) companies as listed above in Paragraph 49 and have submitted semi-annual demonstrations that those 8(a) companies' own employees are performing work under the contract, those demonstrations are false and/or fraudulent because Defendants' 8(a) companies have no employees. Further and similar misrepresentations and false certifications were and are conveyed to the SBA and other governmental entities through bills and invoices for work completed.

141. As a result of Defendants' actions, all requests for payment made to the government under every contract awarded to the Defendants' 8(a) entities, as listed above in Paragraph 49 from 2007 to the present constitute false and/or fraudulent claims. The Defendants knowingly caused such false and/or fraudulent claims to be presented for payment or approval in violation of former 31 U.S.C. § 3729(a)(1); current 31 U.S.C. § 3729(a)(1)(A).

142. The United States paid the false and/or fraudulent claims.

143. By virtue of the false and/or fraudulent claims that the Defendants knowingly presented or caused to be presented, the United States government has suffered substantial monetary damages.

**B. <span>Count II. – False Records or statements – 31 U.S.C. § 3729(a)(2) (former); 31 U.S.C. § 3729(a)(1)(B) (current).</span>**

144. Relator realleges and hereby incorporates by reference each and every allegation contained in all the paragraphs of this Second Amended Complaint.

44

145.     Since 2007 to the present, Defendants knowingly made, used or caused to made or used false records or statements with specific intent to cause false and/or fraudulent claims to be paid or approved by the United States in violation of 31 U.S.C. § 3729(a)(2) (former); 31 U.S.C. § 3729(a)(1)(B) (current).   These false statements or records consist of false certifications or representations, expressed or implied of compliance with all laws, including but not limited to the SBA 8(a) Business Development rules and regulations made or caused to be made by Defendants, in requesting payments from the federal government for performing the contracts at issue in this case.   The Defendants falsely and/or fraudulently certified, explicitly or implicitly, in the applications for participation in the SBA's 8(a) program and in the annual reviews that their statements were true, accurate and correct.   The Defendants falsely and/or fraudulently certified, explicitly or implicitly, that the 8(a) entities, listed above in Paragraph 49, were separate business entities owned by Defendants.

146.     The Defendants falsely and/or fraudulently certified, explicitly or implicitly, that these business entities would pursue contracts that would allow the business to grow, develop and eventually graduate from the program.

147.     The Defendants falsely and/or fraudulently certified, explicitly or implicitly, that the General Managers manage and oversee the 8(a) entities, as listed above in Paragraph 49, performance of the contracts when in fact they do not.

148.     When submitting proposals and/or bids on government contracts, the Defendants falsely and/or fraudulently certified, explicitly or implicitly, that the 8(a), as listed above in Paragraph 49, would itself perform the portion of work commensurate to the contract's cost (often 50%) required by law.   The Defendants have falsely and/or fraudulently demonstrated on a semi-

45

annual basis that the "indefinite contracts" it entered were performed by the 8(a) employees because Defendants' 8(a) companies, as listed above in Paragraph 49, have no employees.

149.     By virtue of the false records or statements that the Defendants have made or used or caused to be made or used, the United States has suffered monetary damages.

## RELIEF

150.     On behalf of the United States Government, the *qui tam* Relator seeks to receive monetary damages equal to three times that suffered by the United States Government.  In addition, the *qui tam* Relator seeks to receive all civil penalties on behalf of the United States Government in accordance with the False Claims Act.

151.     The *qui tam* Relator seeks to be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the False Claims Act.

152.     The *qui tam* Relator seeks to be awarded all costs and expenses for this action, including attorneys' fees and court costs.

153.     The *qui tam* Relator seeks pre-judgment interest at the highest rate allowed by law.

## PRAYER

154.     WHEREFORE, Relator prays that this Court enter judgment on behalf of the Relator and against Defendants for the following:

   a.  Damages in the amount of three (3) times the actual damages suffered by the United States Government as a result of Defendants' conduct;

   b.  Civil penalties against Defendants equal to $11,000 for each violation of 31 U.S.C. § 3729;

   c.  The maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

   d.  All costs and expenses of this litigation, including attorney's fees and costs of court;

   e.  Pre-judgment interest at the highest rate allowed by law; and

46

f. All other relief on behalf of Relator or the United States Government to which they may be entitled and that the Court deems just and proper.

### JURY DEMAND

155. Pursuant to Federal Rule of Civil Procedure 38, Relator demands a trial by jury.


Dated: October 28, 2016

Respectfully submitted,


By: */s/William H. Narwold*

John P. Cashion
(Alaska Bar No. 9806025)
john@cashiongilmore.com
CASHION GILMORE LLC
1007 W. 3rd Ave., Suite 301
Anchorage, AK 99501
Tel.: (907) 222-7936
Fax: (907) 222-7938
john@cashiongilmore.com

William H. Narwold
Mathew P. Jasinski
MOTLEY RICE LLC
20 Church St., 17th Floor
Hartford, CT 06103
Tel.: (860) 882-1681
Fax: (860) 882-1682
bnarwold@motleyrice.com
mjasinski@motleyrice.com

Sarah M. Frazier
BERG & ANDROPHY
3704 Travis St.
Houston, TX 77002
Tel: (713) 529-5622
Fax: (713) 529-3785
sfrazier@bafirm.com

Charles H. Rabon, Jr.
RABON LAW FIRM, PLLC
225 E. Worthington Ave., Ste. 100
Charlotte, NC 28203
Tel.: (704) 247-3247
Fax: (704) 208-4645
crabon@usfraudattorneys.com

*Counsel for Relator Ben Ferris*

47

## CERTIFICATE OF SERVICE

I certify that on January 3, 2017, the foregoing was filed with the Court's electronic filing system which served a copy on all counsel of record.

By: */s/William H. Narwold*
William H. Narwold
MOTLEY RICE LLC
20 Church St., 17th Floor
Hartford, CT 06103
Tel.: (860) 882-1676
Fax: (860) 882-1682
bnarwold@motleyrice.com

**EXHIBITS TO ORIGINAL COMPLAINT**
**AND FIRST AMENDED COMPLAINT**
**INCORPORATED HEREWITH BY REFERENCE**

| Exhibit No. | Description | Bates No. | Docket No. |
|---|---|---|---|
| 1 | Alutiiq FSC Chesapeake Cost Report | BA-BF 0000010-0000021 | Dkt. #1-6 |
| 2 | Afognak Native Corporation and Subsidiaries Monthly Management Report for the Twelve Month Period Ending December 31, 2012 Redaction of Attorney Work Product | BA-BF 0000022-0000161 | Dkt. ##6-1 & 6-2 |
| 3 | Afognak Native Corporation and Subsidiaries Monthly Management Report for the Five Month Period Ending May 31, 2011 | BA-BF 0000162-0000215 | Dkt. #6-3 |
| 4 | Afognak Native Corporation and Subsidiaries Monthly Management Report for the Five Month Period Ending May 31, 2010 | BA-BF 0000216-0000271 | Dkt. #6-4 |
| 5 | Documents Relating to Alutiiq-Melee, LLC Text Message from Bernie Conrow Alutiiq-Melee, LLC March 2011 Annual Update | BA-BF 0000272-0000310 | Dkt. #6-5 |
| 6 | 8(a) Business Development (8(a) & SDB) Annual Review For Alutiiq Business Services, LLC Feb 29, 2012 | BA-BF 0000311-0000326 | Dkt. #6-6 |
| 7 | For Alutiiq Education & Training, LLC Mar 28, 2012 | BA-BF 0000327-0000342 | Dkt. #1-13 |
| 8 | 8(a) Business Development (8(a) & SDB) Application For Alutiiq Commercial Enterprises, LLC Jul 23, 2012 | BA-BF 0000343-0000366 | Dkt. #6-7 |
| 9 | 8(a) Business Development (8(a) & SDB) Annual Review For Alutiiq 3SG, LLC May 15, 2012 | BA-BF 0000367-0000382 | Dkt. #6-8 |
| 10 | 8(a) Business Development (8(a) & SDB) Annual Review For Alutiiq Diversified Services, LLC May 15, 2012 | BA-BF 0000383-0000398 | Dkt. #1-16 |
| 11 | Afognak Native Corporation & ANC Shareholder Settlement Trust 2012 Annual Report | BA-BF 0000404-0000447 | Dkt. ##1-17 to 1-25 |

49

## EXHIBITS TO SECOND AMENDED COMPLAINT

| Exhibit No. | Description | Bates No. | Docket No. |
|---|---|---|---|
| 12 | Correspondence between the Small Business Association and Defendants Nov. 19, 2013 | DEFS_0003585-0003594 | Attached |
| 13 | Correspondence between the Small Business Association and Defendants July 6-23, 2012 | DEFS_0029876-0029879 | Attached |