IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

UNITED STATES OF AMERICA,           )
ex rel. BEN FERRIS,                 )
                                    )
                        Plaintiff,  )
                                    )
        vs.                         )
                                    )
AFOGNAK NATIVE CORPORATION          )
and ALUTIIQ, LLC,                   )
                                    )
                        Defendants. )    No. 3:15-cv-0150-HRH
_____)


O R D E R

Motion to Dismiss for Abusive Litigation Tactics
or, in the Alternative, to Compel Additional Discovery

        Defendants move to dismiss this action as a sanction for abusive litigation tactics, or, in

the alternative, to compel additional discovery.[1]  This motion is opposed.[2]  Oral argument was

requested,[3] but is not deemed necessary.

Background

        Relator in this qui tam action is Ben Ferris.  Defendants are Afognak Native Corporation

and Alutiiq, LLC, which is a wholly-owned subsidiary of Afognak.

_____

[1]Docket No. 234.

[2]Docket No. 242.

[3]Docket No. 247.

-1-

Relator was employed by Alutiiq from March 2008 through March 2014, serving as Alutiiq's Chief Compliance Officer from May 2011 through March 2014.[4]  As Chief Compliance Officer, relator reported to Alutiiq's General Counsel.

While employed by Alutiiq, "[r]elator purchased his own external hard drive to enable him to work from home and on the road...."[5]  Relator had defendants' IT department encrypt the hard drive.[6]  "[T]he only computer to which the drive was connected (other than computers' within [d]efendants' custody or control) was Mr. Ferris's home computer[.]"[7]

After attending a conference in July 2012, relator came to believe that Alutiiq subsidiaries were misrepresenting their small business status when applying for government contracts through the Small Business Administration's 8(a) Business Development Program. Relator believes "that Afognak was misrepresenting and falsely certifying that 8(a) business entities were bidding on and performing the awarded government contracts because these entities did not actually exist as separate business entities."[8]  Relator discussed his belief that defendants were violating the SBA regulations with other Alutiiq employees, including Alutiiq's general counsel.

---

[4]July 2, 2015 Declaration of Amy Shimek [etc.] at 2, ¶ 5, Docket No. 154.

[5]Relator's Responses to Defendants' Second Set of Interrogatories at 3, Exhibit M, Declaration of Angela R. Jones [etc.], Docket No. 236.

[6]Id.

[7]Relator's Response to Defendants' Second Set of Requests for Production at 5, Exhibit V, Jones Declaration, Docket No. 236.

[8]Second Amended Complaint [etc.] at 15, ¶ 39, Docket No. 202.

Relator contacted attorneys in March 2013 about the possibility of filing a <u>qui tam</u> suit.[9] Relator testified that "at some point" after July 2012, he created a file on his external hard drive to put documents "that kind of supported my view that the company knew that they were violating SBA regulations."[10] Relator further testified that after he contacted attorneys in March 2013, he went through his work email folders to look for documents that might be relevant to the claims he was thinking of bringing against defendants and copied any such documents on to his external hard drive.[11] Some of the documents that relator copied to his external hard drive were privileged documents.[12] Relator testified that he was advised "early on" by his attorneys to not "give [them] anything that might be attorney-client [privileged], that I worked for general counsel, and that I needed to be careful about that."[13]

On May 30, 2013, relator commenced this action by filing a complaint under seal in the Northern District of Alabama, in which relator asserted claims against defendants under the False Claims Act (FCA).[14] On June 21, 2013, relator filed an amended complaint.[15]

---

[9]Deposition of Ben Ferris at 52:13-19, Exhibit P, Jones Declaration, Docket No. 236.

[10]<u>Id.</u> at 28:1-5.

[11]<u>Id.</u> at 62:6-63:25.

[12]Relator's Responses to Defendants' Second Set of Interrogatories at 3, Exhibit M, Jones Declaration, Docket No. 236.

[13]Ferris Deposition at 128:20-25, Exhibit P, Jones Declaration, Docket No. 236.

[14]The case was transferred to the District of Alaska on August 25, 2015. Docket No. 104.

[15]Docket No. 6.

In March 2014, relator resigned from Alutiiq. "Prior to leaving [his] employment ...,
[r]elator uploaded to [d]efendants' server all documents from [his external] hard drive that
[r]elator thought might be of value to the [d]efendants. Relator then deleted all documents from
the hard drive except those relevant to this case[.]"[16] Among the documents that relator retained
on his external hard drive were nine attorney-client privileged emails.[17]

On April 3, 2014, after the United States declined to intervene in this action, relator's
amended complaint was unsealed.[18] On January 30, 2015, defendants answered relator's
amended complaint. Defendants "deny that Defendants or Alutiiq's 8(a) Participants have
misrepresented an 8(a) Participant's small business status."[19]

On March 2, 2015, relator produced 494 pages of documents as part of his initial
disclosures.[20] Relator represented that these 494 pages were all the documents that he had in
his "possession, custody, or control" that he might "use to support [his] claims[.]"[21] Relator

---

[16]Relator's Responses to Defendants' Second Set of Interrogatories at 3, Exhibit M,
Jones Declaration, Docket No. 236 (emphasis added).

[17]Defendants contend that relator also kept more than 2,000 pages of confidential
documents.

[18]Docket No. 15.

[19]Defendants' Answer to Relator Ben Ferris' First Amended Complaint at 9, ¶ 38,
Docket No. 53.

[20]Relator's Initial Disclosures at 3, Exhibit B, Jones Declaration, Docket No. 236.

[21]Id.

contends that this production included all of the documents that he had provided to the federal government with his disclosure statement under 31 U.S.C. § 3720(b)(2).[22]

On March 17, 2015, relator produced transcripts for audio files that had not been produced on March 2, 2015 and an unredacted version of a document that had been produced on March 2, 2015.[23]

On March 17, 2015, "in preparation for Rule 26 initial disclosures, ... Tricia Long, a paralegal with Berg & Androphy, [one of the law firms representing relator] directed [relator] to send her any case-related materials not already provided to counsel."[24] "In response, [relator] sent a CD of documents that included the nine [privileged] emails...."[25] Long received the CD on March 19, 2015 and "transferred the documents to a flash drive without reviewing them in any detail or sharing them with anyone else, and sent the flash drive to Price Armstrong [the other law firm representing relator at that time] via FedEx on March 23, 2015."[26] "Price Armstrong received the flash drive from Berg & Androphy on March 26, 2015, and Price

---

[22]A relator is required to provide the government with a "written disclosure of substantially all material evidence and information the person possesses" when the relator files his sealed complaint. 31 U.S.C. § 3730(b)(2).

[23]Email from Oscar Price to David Taylor and others, Exhibit C, Jones Declaration, Docket No. 236.

[24]Relator's Supplemental Response to Defendants' Second Set of Interrogatories, Exhibit O at 3, Jones Declaration, Docket No. 236.

[25]Id.

[26]Id. at 3-4.

Armstrong attorneys (Nick Armstrong and/or Oscar Price) set about to review it in full."[27] They "completed their review ... in early June 2015[.]"[28]

On June 8, 2015, relator advised defendants that he was "making a production of the remaining relevant documents in his possession."[29] The documents in this production were segregated into two folders, one of which had 29 documents,[30] which relator's lawyers advised were "directly relevant to ... the question of whether [d]efendants knew their conduct to be unlawful."[31] Relator's lawyers advised that they had "reviewed" the 29 documents and did not believe that the documents were "protected from discovery" but requested that if defendants believed otherwise, they identify any privileged documents by June 17, 2015.[32]

On June 15, 2015, defendants notified relator that it believed that nine of the 29 documents were privileged documents.[33] Defendants demanded that 1) relator refrain from using the nine privileged documents, 2) return originals and copies of the documents to defendants, 3) identify how relator came to have the documents, 4) identify all occasions on

---

[27]Id. at 4.

[28]Id.

[29]Email Letter from Nick Armstrong to Angie Jones, Exhibit E at 3, Jones Declaration, Docket No. 236.

[30]Jones Declaration at 3, ¶ 9, Docket No. 236. The other file contained 68 documents.

[31]Email Letter from Nick Armstrong to Angie Jones, Exhibit E at 3, Jones Declaration, Docket No. 236.

[32]Id. at 3-4.

[33]Jones Declaration at 3, ¶ 10, Docket No. 236.

which relator or his counsel accessed the documents, 5) identify anyone to whom relator or his counsel disclosed the documents, 6) produce copies of any communications that referred to the documents, and 7) agree to appear at a deposition regarding his receipt, use, and disclosure of the documents.[34]

In response, on June 17, 2015, relator's counsel advised that 1) relator "had access to all these documents through the usual and customary course of his employment," 2) the documents had been segregated, 3) the documents "in no way formed any basis for [r]elator's claims or allegations," and 4) the documents had not been disclosed to any other person besides relator's counsel.[35]  Relator's counsel agreed to destroy its copies of the nine privileged documents, if defendants would agree to submit the documents to the court for in camera review.[36]

On June 22, 2015, defendants propounded five interrogatories on relator,[37] four of which concerned relator's receipt, use, and disclosure of the nine privileged documents.

On June 23, 2015, defense counsel again requested that relator destroy his copies of the nine privileged documents.[38]  On June 24, 2015, relator's counsel advised that relator's copies

---

[34]Email Letter from Jones to Armstrong and Price, Exhibit G at 3, Jones Declaration, Docket No. 236.

[35]Email Letter from Nick Armstrong to Angie Jones, Exhibit H at 2, Jones Declaration, Docket No. 236.

[36]Id. at 3.

[37]Defendant Alutiiq, LLC's Second Set of Interrogatories to Relator Benjamin Ferris, Exhibit J at 6-14, Jones Declaration, Docket No. 236.

[38]Email from Angie Jones to Nick Armstrong, Exhibit K at 2-3, Jones Declaration, (continued...)

of the nine privileged documents (including the copies that had been sent to his attorneys) had been destroyed.[39]

On June 30, 2015, relator moved to compel defendants to produce the nine privileged documents in their entirety.[40]  On July 2, 2015, defendants moved to compel expedited discovery on relator's receipt, use, and disclosure of the nine privileged documents.[41]

On July 6, 2015, relator responded to defendants' interrogatories regarding the nine privileged documents.[42]  Defendants contended that relator's responses were incomplete and evasive.

On September 16, 2016, the court granted defendants' motion to compel and ordered relator to "provide more complete answers to Interrogatory Nos. 11-14" and gave defendants permission to take a deposition of relator "limited to the receipt, use, and disclosure of the nine privileged documents...."[43]

---

[38](...continued)
Docket No. 236.

[39]Email from Nick Armstrong to Angie Jones, Exhibit K at 2, Jones Declaration, Docket No. 236.

[40]Docket No. 73.

[41]Docket No. 77.

[42]Exhibit M, Jones Declaration, Docket No. 236.

[43]Order re Motions to Compel at 14, Docket No. 199.

-8-

On October 5, 2016, relator served his supplemental responses to Interrogatory Nos. 11-14.[44] In these supplemental responses, relator stated that he sent the nine privileged documents to Berg & Androphy to "comply with Rule 26's initial disclosure requirements[.]"[45] He further stated that Berg & Androphy transmitted the nine privileged documents to Price Armstrong "to allow [them] to prepare initial disclosures under Rule 26" and that "Nick Armstrong and Oscar Price accessed the nine emails after receiving them to prepare initial disclosures, and [to] prepar[e] to challenge any assertion of privilege[.]"[46] Relator also stated that Price Armstrong had destroyed the nine emails at defense counsel's request.[47] However, on November 11, 2016, relator "corrected" this statement because only eight of the nine emails had been destroyed by Price Armstrong on June 24, 2015.[48] Relator stated that one of the emails had been "uploaded to an ftp site" as part of relator's June 2015 supplemental production and that Price Armstrong had "emailed a link to access the site to Sarah Frazier and Tricia Long with Berg & Androphy and Jim Barger with Froshin Barger[.]"[49] Relator further stated that "Froshin Barger never accessed the ftp site" and that "Tricia Long downloaded the production to Berg & Androphy's electronic files at that time, but neither she nor anyone at Berg & Androphy reviewed it then or

---

[44] Exhibit O, Jones Declaration, Docket No. 236.

[45] Id. at 6.

[46] Id.

[47] Id. at 6-7.

[48] Exhibit S, Jones Declaration, Docket No. 236.

[49] Id. at 2.

at any time since."[50]  This one email was also sent to Motley Rice and the Rabon Law Firm after they entered the case as law firms representing relator.[51]  Motley Rice lawyer Mat Jasinski "noticed" the email but "did not open the document or review it[.]"[52]  Motley Rice and Berg & Androphy purportedly destroyed their copies of the email on November 3, 2016 and the Rabon Law Firm destroyed its copy on November 8, 2016.[53]  Relator stated that the email had been reviewed by a contract attorney at Motley Rice in July 2016, who was cataloging all the documents that have been produced by both sides in this case, but that other than "this non-substantive review," the document "has never been reviewed by anyone with Motley Rice."[54]

On November 2, 2016, relator's deposition was taken.  Relator testified that he had retained the nine privileged documents because he thought they were relevant to his claims.[55]  Relator testified that he may have accessed some of the nine privileged documents after he had loaded them on his external hard drive,[56] but that after he left Alutiiq's employ, he "wasn't going into that hard drive ... and ... looking at those documents.  I ... had no reason to[.]  I wasn't

_____

[50]Id.

[51]Id.

[52]Id.

[53]Id. at 2-3.

[54]Id. at 2.

[55]Ferris Deposition at 48:13-15; 53:4-9; 61:17-24, Exhibit P, Jones Declaration, Docket No. 236.

[56]Id. at 35:9-36:22.

-10-

like pulling them up and reading them...."[57] Relator also testified that he had probably reviewed the nine privileged documents prior to his complaint being filed.[58] He testified that he did not recall ever telling his attorneys that he had privileged documents in his possession.[59] During his deposition, on the advice of counsel, relator refused to answer questions 64 times. Relator contends that he refused to answer questions because they were beyond the scope of the deposition which was limited to his receipt, use, and disclosure of the nine privileged documents. Defendants contend that relator refused to answer relevant questions.

On November 18, 2016, defendants served fourteen requests for production on relator seeking documents that they contend are related to his "taking, use and transfer of the" nine privileged documents and "[d]efendants' other confidential documents."[60] Defendants sought production of, among other things, 1) the hard drive to which relator copied the nine privileged documents, 2) identification of the personal email account he used to send documents to his counsel, 3) a device installation log from Price Armstrong's computers, showing when and how often Price Armstrong lawyers accessed the flash drive that Androphy & Berg sent, and 4) communications with or among relator and his attorneys regarding the nine privileged documents.

---

[57]Id. at 49:16-25.

[58]Id. at 136:10-18.

[59]Id. at 111:8-12.

[60]Defendants' Motion to Dismiss for Abusive Litigation Tactics, or, in the Alternative, to Compel Additional Discovery at 8, Docket No. 234.

-11-

On December 19, 2016, relator responded to the requests for production by stating that he would not produce any documents or other evidence in response.[61]  It was in this response that relator advised defendants that he had disposed of his home computer "with the other trash in December 2015."[62]  Relator avers that he replaced his home computer "because it was not functioning properly.  Its performance was slow, and I began to encounter numerous error messages."[63]

On March 20, 2017, relator corrected his supplemental response to defendants' second set of interrogatories.  In this corrected response, relator disclosed for the first time that "[o]n December 30, 2013, [he] sent an email to a Berg & Androphy associate – who is no longer employed by that firm – that included, as an attachment" one of the privileged emails.[64] Relator stated that "[t]he associate saved [the] December 30, 2013 email as an Outlook (.msg) file to a folder on Berg & Androphy's network and forwarded it to Sarah Frazier [relator's lawyer], but Attorney Frazier has no recollection of receiving [relator's] email or accessing its attachments and has no knowledge of the content of the attachments."[65]  Relator further stated

---

[61]Exhibit V, Jones Declaration, Docket No. 236.

[62]Id. at 5.

[63]Declaration of Ben Ferris [etc.] (dated March 29, 2017) at 1, ¶ 5, which is appended to Relator's Opposition [etc.], Docket No. 242.

[64]Relator's Corrected Supplemental Responses to Defendants' Second Set of Interrogatories, Exhibit 1 at 2, Declaration of Mathew P. Jasinski [etc.], which is appended to Relator's Opposition, Docket No. 242.

[65]Id. at 3.

that on January 23, 2017, Jasinski of Motley Rice had discovered relator's December 30, 2013 email with attachments "in one of the electronic folders that had been transferred from Berg & Androphy to Motley Rice and Chet Rabon after they entered the case."[66]   The email was "produced to [d]efendants in its native format, without review, as part of [r]elator's supplemental production on February 17, 2017."[67]   After defendants asserted privilege as to the document and its attachments, relator's counsel "segregated all known copies."[68]

On April 12, 2017, a lawyer at Berg & Androphy advised defense counsel that one of the privileged emails had been sent to Weidner & Associates, an Anchorage firm that considered representing relator.[69]   Defense counsel was advised that Weidner & Associates had returned to Berg & Androphy the original flash drive that had been used to transmit the case files and that the returned flash drive had been segregated.[70]   It was further advised that Berg & Androphy was not aware yet if "the Weidner firm ever undertook review of the transferred files[.]"[71]

---

[66]Id. at 5.

[67]Id. at 6.

[68]Id.

[69]Letter from Sarah M. Frazier to Angela R. Jones at 1, Exhibit AA, Supplemental Declaration of Angela R. Jones [etc.], Docket No. 246.

[70]Id.

[71]Id.

-13-

Defendants now move to dismiss relator's amended complaint as a sanction for abusive litigation tactics. In the alternative, defendants move to compel relator to continue his deposition and produce documents responsive to their November 18, 2016 discovery requests.

<u>Motion to Dismiss</u>

Defendants move for dismissal of relator's amended complaint pursuant to the court's inherent powers, which provide an "acceptable ground" for dismissal. <u>Halaco Engineering Co. v. Costle</u>, 843 F.2d 376, 380 (9th Cir. 1988). "Dismissal under a court's inherent powers is justified in extreme circumstances, in response to abusive litigation practices, and to insure the orderly administration of justice and the integrity of the court's orders." <u>Id.</u> (internal citations omitted).

> Before imposing the harsh sanction of dismissal, the district court must weigh several factors:
>
>> "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions."

<u>Anheuser-Busch, Inc. v. Natural Beverage Distributors</u>, 69 F.3d 337, 348 (9th Cir. 1995) (quoting <u>Henry v. Gill Indus., Inc.</u>, 983 F.2d 943, 948 (9th Cir. 1993)). "Because the first two of these factors will generally favor the imposition of sanctions, and the fourth factor cautions against dismissal, 'the key factors are prejudice and the availability of lesser sanctions.'" <u>Jackson v. Microsoft Corp.</u>, 211 F.R.D. 423, 431 (W.D. Wash. 2002) (quoting <u>Wanderer v. Johnston</u>, 910 F.2d 652, 656 (9th Cir. 1990)). In addition, because this is a <u>qui tam</u> case, the

-14-

court must consider "the government interests at stake." <u>United States ex rel. Lujan v. Hughes Aircraft Co.</u>, 67 F.3d 242, 247 (9th Cir. 1995) (citation omitted). This "'list of factors amounts to a way for a district judge to think about what to do, not a series of conditions precedent before the judge can do anything, and not a script for making what the district judge does appeal-proof.'" <u>Jackson</u>, 211 F.R.D. at 431 (quoting <u>Valley Eng'rs Inc. v. Elec. Eng'g Co.</u>, 158 F.3d 1051, 1057 (9th Cir. 1998)).

"For dismissal to be proper, the conduct to be sanctioned must be due to 'willfulness, fault, or bad faith.'" <u>Anheuser-Busch</u>, 69 F.3d at 348 (quoting <u>Henry</u>, 983 F.2d at 946). "Due process concerns further require that there exist a relationship between the sanctioned party's misconduct and the matters in controversy such that the transgression 'threaten[s] to interfere with the rightful decision of the case.'" <u>Id.</u> (quoting <u>Wyle v. R.J. Reynolds Indus., Inc.</u>, 709 F.2d 585, 591 (9th Cir. 1983)). "It is well settled that dismissal is warranted where ... a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings: 'courts have inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice.'" <u>Id.</u> (quoting <u>Wyle</u>, 709 F.2d at 589).

The court begins with the question of whether there was willfulness, fault, or bad faith here. "In cases where the drastic sanctions of dismissal or default are ordered, the range of discretion for a district court is narrowed and the losing party's non-compliance must be due to willfulness, fault, or bad faith." <u>Halaco Engineering</u>, 843 F.2d at 380. "A finding of any of these circumstances can justify the sanction of dismissal." <u>Id.</u> "Wilfulness is correctly defined

-15-

as disobedient conduct not shown to be outside the control of the litigant." <u>Deshazier v.</u> <u>Williams</u>, No. 1:06-CV-00591-AWI-SMS, 2007 WL 3010578, at *2 (E.D. Cal. Oct. 15, 2007). "[B]ad faith ... includes a broad range of willful improper conduct." <u>Fink v. Gomez</u>, 239 F.3d 989, 992 (9th Cir. 2001). "Sanctions are available for a variety of types of willful actions, including recklessness when combined with an additional factor such as frivolousness, harassment, or an improper purpose." <u>Id.</u> at 994.

Relator argues that the evidence does not show that he willfully took defendants' confidential and privileged documents. Relator argues that this is not a case of someone who understood the attorney-client privilege but chose to disregard it and make off with privileged documents. Rather, relator contends that he believed that the legal department was part of the fraud and that he believed that his communications with the legal department were not privileged but rather were to notify appropriate people within Alutiiq that defendants were violating SBA regulations. And, relator argues that public policy protects relators who retain <u>confidential</u> documents for the purpose of reporting government fraud. Relator contends that much of defendants' motion to dismiss is based on their claim that he retained confidential documents in breach of his employment agreement with Alutiiq. In <u>United States ex rel.</u> <u>Cafasso v. General Dynamics C4 Systems, Inc.</u>, 637 F.3d 1047, 1062 (9th Cir. 2011), "[t]he Ninth Circuit observed that a public policy exception to enforcement of confidentiality agreements 'that would allow relators to disclose confidential information in furtherance of an FCA action' has 'some merit.'" <u>Siebert v. Gene Security Network, Inc.</u>, Case No. 11–cv–01987–JST, 2013 WL 5645309, at *7 (N.D. Cal. Oct. 16, 2013). "Several courts, some

-16-

relying on the Ninth Circuit's openness to the public policy exception ..., have adopted just such an exception." Id.

Relator suggests that this court adopt such an exception, particularly since he never publically disclosed any of defendants' confidential information but only gave copies of confidential and privileged documents to his lawyers. Relator contends that the allegation that he breached his alleged contractual obligations or wrongfully disclosed confidential information by providing documents to his attorneys directly contravenes Congress' intent to protect whistleblowers. Relator insists that the law does not permit his case to be dismissed because he retained and disseminated to his attorneys corporate documents that he believed were evidence of defendants' fraudulent conduct.

In Cafasso, the relator had appropriated files from her employer which contained information that was covered by her confidentiality agreement. Cafasso, 637 F.3d at 1061. Her employer brought a counterclaim against her based on this misappropriation. Id. Cafasso "urge[d the court] to adopt a public policy exception to enforcement of such contracts that would allow relators to disclose confidential information in furtherance of an FCA action." Id. at 1062. As set out above, the Ninth Circuit saw "some merit in the public policy exception that Cafasso proposes" but the Ninth Circuit did not adopt such a policy exception. Id. The Ninth Circuit noted however, that "[e]ven were we to adopt such an exception, it would not cover Cafasso's conduct given her vast and indiscriminate appropriation of GDC4S files. Cafasso copied nearly eleven gigabytes of data—tens of thousands of pages." Id. Moreover, the Ninth Circuit observed that "[w]ere we to adopt a public policy exception to confidentiality

-17-

agreements to protect relators, ... those asserting its protection would need to justify why removal of the documents was reasonably necessary to pursue an FCA claim." Id.

Although relator did not take as many documents as Cafasso, he took nine privileged documents and there is nothing in Cafasso that suggests that the Ninth Circuit would apply a public policy exception to privileged documents. Second, relator has made no showing that the privileged documents he took were reasonably necessary to pursue his FCA claims. Nor could relator make such a showing because by the time he resigned his employment with Alutiiq, he had already filed his complaint and an amended complaint and had his relator interview with the government. Relator did not need to retain any of defendants' privileged documents in order to pursue his FCA claims. Even if the court were to adopt the policy exception urged by relator, such an exception would not apply to relator's retention of the nine privileged documents.

The evidence also shows that relator accessed and used the nine privileged documents by sending them to his attorneys, who then used them in connection with relator's case. Relator has admitted that he sent the nine privileged documents to his attorneys in March 2015 and that the Price Armstrong attorneys accessed and reviewed them "to prepare initial disclosures, and in preparing to challenge any assertion of privilege[.]"[72] This admission by relator is sufficient to show that the nine privileged documents were used by him and his attorneys and that this use was intentional.

---

[72]Relator's Supplemental Response to Defendants' Second Set of Interrogatories, Exhibit O at 6, Jones Declaration, Docket No. 236.

Moreover, the evidence shows that the Price Armstrong attorneys conducted their own privilege review of the documents. Relator has admitted that the Price Armstrong reviewed the nine privileged documents so that they could assert that the documents were not privileged. This conduct by the Price Armstrong lawyers was improper. As one court has observed,

> [t]here is no doubt that the spirit of ethical standards in this district, if not the letter of the rules, prohibits an attorney from conducting his or her own privilege review of documents belonging to a corporation he or she is preparing to sue, and then copying and retaining documents marked privileged or confidential for nearly 18 months before notifying the privilege holder.

Arnold v. Cargill Inc., Case No. 01–2086 (DWF/AJB), 2004 WL 2203410, at *10 (D. Minn. Sept. 24, 2004).

The evidence also shows that relator's and his attorneys' statements concerning the receipt, use, disclosure, and destruction of the nine privileged documents have not been as straightforward as one would expect in the litigation setting. For example, in a May 4, 2016 filing with the court, relator contended that the nine privileged documents "were, like the rest of his emails on his laptop with the consent of the company and in order to do his job" and that he did not "'surreptitiously take' them."[73] But, in fact relator kept these emails after he left Alutiiq's employ and without Alutiiq's consent. Relator also originally represented that his "counsel did not rely on [the nine privileged] documents in pleading the case or otherwise[,]"[74]

---

[73]Relator Ben Ferris's Supplemental Response to Defendants' Motion to Compel Expedited Discovery at 3, Docket No. 165.

[74]Id. (emphasis added).

-19-

but relator has now admitted that he sent the nine privileged emails to his lawyers to use in preparing his initial disclosures and that his lawyers used the documents for that purpose. In addition, relator's attorneys' keep finding copies of the documents in question, despite representations that all of the copies of the nine privileged emails have been destroyed. While all of this may be more of a function of the fact that relator has had several different law firms representing him at various times, it does nothing to reassure the court that relator and his lawyers properly handled the nine privileged documents once they realized that they had such documents.

In addition to the misrepresentations about the receipt, use, disclosure, and destruction of the nine privileged documents, defendants argue that there has been spoliation of evidence, which defendants contend is further evidence that relator has acted willfully and in bad faith. "A party's destruction of evidence qualifies as willful spoliation if the party has 'some notice that the documents were <u>potentially</u> relevant to the litigation before they were destroyed.'" <u>Leon v. IDX Systems Corp.</u>, 464 F.3d 951, 959 (9th Cir. 2006) (quoting <u>United States v. Kitsap Physicians Serv.</u>, 314 F.3d 995, 1001 (9th Cir. 2002)).

Defendants contend that the spoliated evidence is relator's external hard drive, relator's home computer, and the Berg & Androphy flash drive and hard drive. There is no dispute that these items cannot be produced, and the destruction or loss of these items involved bad judgment and/or poor practices all around. However, there is no evidence that anything of value to this case was lost as a result of the destruction or loss of these items. All of these items at some point may have contained all or some of the nine privileged documents that relator took

-20-

from defendants. But, there is no evidence that defendants' data was lost. The documents in question might be relevant (but inadmissible) to relator's FCA claim, but defendants still have the documents in their files. In short, nothing of value to this case has been lost. Nevertheless, relator's and his attorneys' failure to preserve the computer, the hard drives, and the thumb drive is some evidence of willful conduct on the part of relator and his attorneys as it pertains to the nine privileged documents.

Once privileged documents get loose, containing the problem is difficult. Relator should have known not to take the nine privileged documents in the first place; and having been warned by his attorneys about the attorney-client privilege issue, he himself could have and should have acted to head off what developed. Relator's attorneys might have but failed to limit the damage flowing from relator's bad judgment in keeping the nine documents by failing to halt review of the documents and by using the documents, even though their nature was observed, and by failing to prevent the spread of the documents amongst multiple law firms.

It is a close question whether relator's conduct was willful. Relator deliberately took and retained the nine documents. What transpired thereafter was relator's fault. Relator knew better than to retain attorney-client communications. Relator's attorneys should have known better than to involve themselves in relator's indiscretion. In consideration of all of the foregoing, the court concludes that relator's and his attorneys' conduct with respect to the nine documents in question was deliberately disobedient to established norms of litigation conduct. In other words, the court concludes that relator's and his attorneys' conduct with respect to the nine privileged documents was willful.

-21-

The court next considers whether relator's and his attorneys' willful conduct "relate[s] to matters in controversy in such a way as to interfere with the rightful decision of the case." Halaco Engineering, 843 F.2d at 381. Relator took the position in his motion to compel that the nine privileged emails are relevant to this case. In light of this position, relator cannot now contend that his and his attorneys' conduct as it relates to the nine privileged emails is not closely tied to the matters in controversy. But that is not necessarily the same as saying that this conduct is related to matters in controversy in such a way as to interfere with the rightful decision of the case. There have been some misrepresentations by relator and his counsel as to the receipt, use, disclosure, and destruction of the nine privileged documents. Relator has certainly played a little fast and loose with the truth, and the court is not at all convinced that relator's and his attorneys' conduct has been all innocent mistakes and minor discrepancies, as relator contends. At best, relator's and his attorneys' management of the problem created by relator taking and retaining documents protected by the attorney-client privilege was clumsy. But, the misstatements that were made with the respect to the nine privileged documents relate to a collateral matter that, in the court's judgment, will not interfere with a rightful decision on relator's contention that defendants violated the FCA.

The court next turns to the question of whether defendants have been prejudiced by relator's and his attorneys' willful conduct. Defendants first argue that they do not need to establish prejudice because as a result of relator's spoliation, they are entitled to an evidentiary presumption that the destroyed evidence would have been unfavorable to relator. However, because defendants have not established any spoliation of evidence which could support their

-22-

defenses to relator's FCA claims, there is no reason for the court to consider any evidentiary presumption. Again, what has transpired here has in no way deprived defendants of any documents, for defendants have had possession of the original documents all along.

Defendants next argue that "it is certainly prejudicial to collect an opposing party's critical documents without authorization and then use them in litigation to gain an unfair advantage." Xyngular Corp. v. Schenkel, 200 F. Supp. 3d 1273, 1320-21 (D. Utah 2016). Defendants argue that this is exactly what relator did, collected their privileged and confidential documents to gain an unfair tactical advantage. Defendants also argue that they have been prejudiced by the fact that relator's lawyers used the nine privileged emails to support this litigation. And defendants argue that they have been prejudiced by the fact that relator destroyed his home computer, which would have been the best evidence showing the full extent of his access to and use of the nine privileged emails. Defendants contend that by destroying his home computer (and by deleting the files from his external hard drive), relator has prevented them from obtaining forensic evidence of his access and use of the nine privileged documents.

The court is not persuaded that defendants have been prejudiced by relator's or his attorneys' conduct. The fact that relator had access to documents that were protected by the attorney-client privilege is not a fact that supports or tends to establish relator's FCA claim as long as no further use of the documents by relator is allowed. The court's foregoing digest of how the attorney-client privilege issue developed shows that relator's and his attorneys' actual use of the nine privileged documents was minimal. The documents were made available to relator's attorneys, and the attorneys in turn reviewed the documents in connection with relator's

initial disclosures and improperly conducted their own privilege review. In addition, at this point in time, it appears that all extant copies of the documents which were in the possession of relator or his attorneys have been destroyed, returned, or segregated.

Because this is a <u>qui tam</u> case, the court must also consider the government interests at stake. Here, dismissing relator's complaint would not prejudice the United States' interest in this case in any way because such a dismissal would "not foreclose the <u>government</u> (or, for that matter, a different relator) from bringing suit." <u>United States v. Quest Diagnostics Inc.</u>, 734 F.3d 154, 167 (2d Cir. 2013).

That brings the court to the consideration of lesser sanctions. "'[E]fficacy of lesser sanctions' is a necessary criterion" for the court to consider when deciding whether to exercise "its inherent powers to impose sanctions for discovery abuses." <u>Unigard Sec. Ins. Co. v. Lakewood Engineering & Mfg. Corp.</u>, 982 F.2d 363, 369 (9th Cir. 1992) (quoting <u>Halaco Engineering</u>, 843 F.2d at 380). Possible sanctions "include dismissal of the action, the compelled return of all documents, restrictions regarding the use of the documents at trial, disqualification of counsel and monetary sanctions." <u>Lynn v. Gateway Unified School Dist.</u>, Case No. 2:10–CV–00981–JAM–CMK, 2011 WL 6260362, at *5 (E.D. Cal. Dec. 15, 2011). "Courts have considerable discretion in choosing the appropriate sanction under its inherent authority and may, for example, dismiss claims, enter default judgment, and award attorney's fees and costs." <u>Id.</u>

Attorney disqualification would probably accomplish little in this case because it was relator who initially took, retained, and disclosed the nine privileged documents. Moreover, the

Price Armstrong lawyers are the only attorneys who have admittedly reviewed the documents in question and they are no longer representing relator. Returning the nine documents would not be an adequate sanction by itself because it appears that all copies of the documents have now finally been returned, destroyed, or segregated. Precluding relator from using the privileged documents at trial is not an adequate sanction because relator could never have used these attorney-client privileged documents at trial. But the court is not persuaded that dismissal, which is the harshest sanction, is the only sanction available to address relator's and his attorneys' deliberate disobedience to the established norms of litigation conduct. Monetary sanctions could adequately address relator's and his attorneys' conduct in this case, given that the court has concluded that defendants were not prejudiced by reason of relator's and his attorneys' handling of the attorney-client privileged documents.

In sum, as to defendants' motion to dismiss, the court concludes that dismissal of this action would not be appropriate. Although relator's and his attorneys' conduct as it relates to the nine privileged documents was willful, the relationship between that misconduct and the matters in controversy are not such that the misconduct threatens to interfere with a rightful decision on relator's claims and defendants' defenses thereto. In addition, although relator's and his attorneys' handling of the attorney-client privileged documents has interfered with the expeditious resolution of this case and with the court's need to manage its docket, defendants were not prejudiced by relator's and his attorneys' access to and minimal use of the nine privileged documents. Although the government's interest in this case would not be impaired if the court were to dismiss relator's claims, this court has a strong preference for seeing cases

-25-

resolved on their merits, and there are plainly sanctions available which are less drastic than dismissal of the case.

Although dismissal is not warranted, some sanctions are appropriate. The following sanctions are imposed:

(1) From this point forward, relator and his attorneys shall have no access to any of the nine attorney-client privileged documents in question. Under no circumstances will the court entertain any effort by relator to regain possession of those documents through discovery proceedings.

(2) Each of relator and the law firms and their employees who have been involved in this case to date shall reexamine all of their files (including computer files) to verify, and then separately certify to the court, that they have destroyed or returned to defendants all copies of the nine documents in question. These certifications shall be filed on or before July 19, 2017. Should it be discovered at any time after July 19, 2017 that relator has retained any copies of the nine privileged documents, relator's case will be subject to immediate dismissal. Should it be discovered at any time after July 19, 2017, that any of relator's attorneys have failed to destroy or return to defendants any copies of the nine privileged documents, those attorneys will be subject to immediate disqualification.

(3) The court will entertain defendants' application for an award of attorney's fees against relator. In the application, defendants may include all

-26-

attorney charges and costs which defendants' billing statements have identified as occasioned by relator's possession and retention of the nine privileged documents. Defendants' application with supporting documentation shall be filed on or before July 19, 2017. No response from relator to defendants' application will be entertained. Once the court has determined the amount of this sanction, relator shall pay the sanction forthwith.

### Motion to Compel

Defendants first move to compel relator to continue his deposition. "A party seeking discovery may move for an order compelling an answer ... if a deponent fails to answer a question asked...." Fed. R. Civ. P. 37(a)(3)(B)(i). There is no dispute that relator refused to answer 64 questions as being beyond the scope of the deposition which was limited to relator's receipt, use, and disclosure of the privileged documents.

The questions that relator refused to answer fall into three general categories: 1) questions concerning relator's access and use of other documents, many of which defendants contend were confidential documents, 2) questions about whether relator breached his contractual obligations to Alutiiq, and 3) relator's communications with his lawyers about the nine privileged documents. These questions were beyond the scope of the limited deposition that the court had allowed or were questions seeking relator's privileged communications with his lawyers. Relator is not compelled to continue his deposition.

Defendants also argue that relator should be compelled to produce 1) the devices he and his attorneys used to access the privileged documents or installation logs from those devices, 2) documents containing communications he made when disclosing the privileged emails to his attorneys, and 3) documents identifying the email account(s) he used to make those communications. Defendants argue that this discovery is relevant as it goes to relator's and his attorneys' access and use of the nine privileged documents. In particular, defendants contend that relator's hard drive is relevant because forensic analysis may be able to obtain relevant information about what documents were stored on the hard drive, how those documents were organized, when those documents were deleted, and whether those documents were ever altered. Defendants support this contention with the declaration of Ashraf Massoud, the "Associate Director of Forensics and Collections at Epiq eDiscovery Solutions, Inc."[75] Massoud explains that it is difficult to obtain information from an external hard drive but that doing a forensic analysis might yield some information as to when a document on the hard drive was accessed and the filename and file path of deleted documents and that it may be possible to recover deleted documents.[76] As for relator's personal email account address, defendants contend that relator has admitted that he used this account to send documents to his lawyers and thus they need the address to corroborate relator's statements about when he sent the privileged documents to his lawyers. Similarly, defendants argue that any device installation log remaining on Price

---

[75]Declaration of Ashraf Massoud at 2, ¶ 1, Docket No. 237.

[76]Id. at 4-6, ¶¶ 10-12, 15-16.

-28-

Armstrong computers is relevant so they can evaluate the extent to which the Price Armstrong lawyers accessed the privileged documents.

Rule 37(a)(3)(B), provides, in pertinent part, that "[a] party seeking discovery may move for an order compelling ... production[.]" Rule 34(a) permits each party to serve the opposing party with document requests within the scope of Rule 26(b) that are "relevant to any party's claim or defense...." Fed. R. Civ. P. 26(b). "Relevancy for discovery purposes is construed broadly to encompass 'any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in a case.'" E.E.O.C. v. Wal-Mart Stores, Inc., 276 F.R.D. 637, 641 (E.D. Wash. 2011) (quoting Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340 (1978)). But, "[e]ven if evidence is discoverable and relevant under Rules 34 and 26, the Rules contain some express constraints, boundaries both 'ultimate and necessary,' on discovery's otherwise sprawling reach." United States ex rel. Carter v. Bridgepoint Educ., Inc., 305 F.R.D. 225, 237 (S.D. Cal. 2015) (quoting Hickman v. Taylor, 329 U.S. 495, 506 (1947)). Most significantly, Rule 26(b)(1) provides, in pertinent part, that discovery must be "proportional to the needs of the case[.]"

Assuming that any of the foregoing evidence is relevant, which the court is not convinced that it is, this discovery is disproportionate to the needs of the case. Defendants have sufficient information about relator's and his attorney's access to and use of the nine privileged documents. Relator is not compelled to produce 1) the devices he and his attorneys used to access the privileged documents or installation logs from those devices, 2) documents

-29-

containing communications he made when disclosing the privileged emails to his attorneys, or 3) documents identifying the email account(s) he used to make those communications.

Conclusion

Defendants' motion for a hearing[77] is denied.

Defendants' motion to dismiss[78] is denied, but sanctions are imposed as set out above in detail. Defendants' motion to compel is also denied. Other than the filing of the required certifications and the determination the amount of attorney's fees, it is time to be done with this issue of the nine attorney-client privileged documents.

DATED at Anchorage, Alaska, this 28th day of June, 2017.

/s/ H. Russel Holland
United States District Judge

---

[77]Docket No. 247.

[78]Docket No. 234.

-30-